**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Daniel J. D'ALORA,**
**Defendant-Appellant.**

No. 77–1183.

United States Court of Appeals,
First Circuit.

Submitted March 7, 1978.

Decided Oct. 5, 1978.

Stanley M. Meyer, Brooklyn, N.Y., by appointment of the Court, on brief, for defendant-appellant.

Edward F. Harrington, U. S. Atty., and Walter B. Prince, Asst. U. S. Atty., Boston, on brief, for plaintiff-appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Appellant Daniel J. D'Alora was convicted by a jury of possession and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Appellant was one of four original defendants named in a three count indictment.

Count I of the indictment charged John P. Seretta and Robert A. Fisher with possession and distribution of cocaine on September 21, 1976. Count II charged Seretta, Fisher, D'Alora, and Joseph Giordano with possession and distribution of cocaine on October 1, 1976. Count III charged D'Alora and Giordano with possession of a firearm during the commission of the crimes charged in Count II.

Seretta and Fisher pled guilty to Counts I and II. D'Alora and Giordano were tried together on Counts II and III. During the trial, Count III was dismissed. Giordano was acquitted.

Three issues are raised on appeal: (1) whether the admission into evidence of money found on appellant after his arrest which had been used in a prior narcotics transaction involving one of the other defendants (Seretta) was improper; (2) whether a mistrial should have been granted at the time Count III—the gun count—was dismissed; and (3) whether the district court erred in not holding a hearing or taking some action in response to defense counsel's claim that the jury panel did not meet the constitutional requirements of representing a fair cross-section of the community.

### THE FACTS

A somewhat detailed exposition of the facts is necessary in order to understand the issues.

On September 21, 1976, Seretta and Fisher sold one ounce of cocaine to Angel Diaz. Diaz was a detective of the Hartford, Connecticut Police Department on assignment as an undercover agent of the Drug Enforcement Agency (DEA) investigating narcotics sales in western Massachusetts. Seretta met Diaz in the Top-O-The-Round Restaurant at the Holiday Inn in Springfield, Massachusetts, at about 7:00 P. M. The two went downstairs to Room 416, where Diaz was given the cocaine and, in exchange, paid Seretta $1,800 in marked bills. Diaz told Seretta he was interested in purchasing larger amounts of cocaine. Seretta gave Diaz his telephone number and told him to call the next day.

The next day, September 22, Diaz telephoned Seretta to confirm the availability of the cocaine. This conversation was recorded and introduced into evidence by the government. Seretta told Diaz to call him back. On September 26, Diaz again telephoned Seretta. Seretta stated he was trying to make a "connection" in Miami who would supply him. This conversation was also recorded and introduced into evidence. On September 29, Diaz telephoned Seretta, who informed him that everything was set as he had just returned from the South.

On September 30, Diaz telephoned Seretta again and Seretta told him that he had spoken with his source in New York, that the deal was ready to go through the next day, and Seretta would introduce Diaz to the New York people at this time. This conversation, too, was recorded and became part of the evidence. On October 1, 1976, a final phone conversation between Diaz and Seretta took place. Seretta told Diaz that the transaction was set for 7:00 P. M. at the Holiday Inn in Springfield, Massachusetts.

DEA agents and the local police staked out the Holiday Inn. They were positioned outside the building and in Room 414 where they could witness the "buy" which was to take place in Room 416. At about 6:15 P. M., a white Chevrolet van with Massachusetts license plates was observed entering the parking lot of the Holiday Inn. It was followed by a dark brown four-door Mercury with New York license plates. The van stopped at about the middle of the parking lot and the Mercury pulled alongside of it. Fisher was driving the van with Seretta as a passenger. Appellant was driving the Mercury with Giordano in the passenger's seat. Seretta and the appellant talked for a few minutes and then appellant drove off. Seretta left the van and entered the front door of the Holiday Inn. Meanwhile, appellant and Giordano returned, parked, got out of the car, and stood around the front door of the Inn.

At about 6:50 P. M. Diaz drove into the parking lot, parked his car, and entered the rear door of the Holiday Inn. He took the elevator to the Top-O-The-Round Restaurant where Seretta met him as planned and told him that the people from New York were downstairs, but did not want to meet Diaz because the price had already been set. Diaz replied that the money was being held in a room downstairs. He told Seretta he would like to see the cocaine first, and then Seretta could see the money. Following this, Seretta could come up to the room with the cocaine and the sale would be made. Seretta agreed and he left the lounge. Diaz also left a few minutes later and met Seretta in the main lobby. Seretta informed him that the people from New York were controlling the transaction, that they did not want to meet him, and that Seretta wanted to see the money first. Diaz agreed to this, and the two went to Room 416 where Agent Breard, acting as moneyman, showed Seretta $12,000 in cash. Seretta left, saying he would return in five minutes. Seretta was observed leaving the front door of the Holiday Inn. He spoke with appellant and Giordano who had been standing there. After two or three minutes, the three separated. Appellant and Giordano walked through the parking lot, glancing back at the Mercury as they went. Seretta, meanwhile, walked over to the Mercury, opened the driver's door, bent over into the car, and removed a brown paper bag from the front seat. He closed the door and walked over to Fisher, still in the van. The two then entered the front door of the Holiday Inn. Seretta and Fisher were admitted to Room 416 where Fisher pulled up his shirt, removed a brown paper bag, and handed it to Agent Breard. The bag contained one-half pound of cocaine in two cellophane envelopes covered with tinfoil. Seretta and Fisher were immediately arrested. A signal was transmitted and appellant and Giordano were arrested in the street.

A search of Seretta produced the keys to the Mercury. When appellant was searched, he had in his possession a valid Florida driver's license issued to Daniel Orlando and $634. Giordano had $1,904 on him when he was arrested. A search of the Mercury disclosed a .38 caliber revolver on the passenger's seat and an automobile

rental agreement showing that the car had been rented at 11:20 that morning in Brooklyn, New York, to a person using the name Orlando. A rental agent testified that a person by the name of Orlando had rented cars on this and prior occasions.

Of the $634 found on appellant when he was arrested, $400 was the marked money which Diaz had given to Seretta on September 21. Of the $1,904 found on Giordano, $1,060 was also marked money from that transaction.

Appellant did not testify. Giordano took the stand and testified, in effect, that he was an innocent bystander who rode up from New York City with appellant in the hope of collecting a business debt.

I. *Introduction of the Marked Money Given to Seretta on September 21.*

Appellant's contention is that the trial court erred in admitting into evidence the marked money given by Diaz to Seretta and Fisher in the September 21 cocaine sale. He argues not only that this evidence was irrelevant, but that its probative value was outweighed by its prejudicial impact.

Fed.R.Evid. 404(b) provides:

*Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ All relevant evidence may be admitted as long as it has some other purpose than to show propensity to commit crime if its probative value outweighs its prejudicial impact. *United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976).

■ Appellant argues that the September 21 incident is irrelevant because he was not charged with a commission of a crime on that day. The government argues that it was relevant, contending that the October 1 transaction originated during the September 21 sale. It was at this time that

Diaz inquired about larger amounts of cocaine which culminated in the attempted sale and arrest on October 1. The evidence concerning the September 21 sale was not irrelevant simply because appellant was not charged with committing a crime on that date. It is not necessary that facts, appearing alone, be sufficient to sustain a conviction to pass the test of relevancy. Rather, all that is needed is a showing that the evidence "tended to logically associate appellant with that particular crime" and enhance the probability of guilt. *United States v. Eatherton,* 519 F.2d 603, 611 (1st Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). Evidence is not to be examined in isolation, but in its particular factual setting. *Id.* Evidence of prior conduct is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." 2 Weinstein's Evidence §§ 404(09), 404–57 (1975), quoting McCormick on Evidence § 157 (1954); *United States v. Barrett, supra,* 539 F.2d at 248.

But appellant argues that he was not present on the 21st and his identity was learned only after his arrest on October 1. While this is true, it does not render the evidence irrelevant. Appellant's possession of the money paid to Seretta could be properly considered by the jury as one link in a chain of evidence pointing to him as the "connection" from the South, or Seretta's "source" in New York, or as one of "the New York people" who were "running the deal."

Appellant points out that the money could as easily have wound up in the hands of a butcher or a jeweler as himself. This is true, but the point is not that the money could have found its way to anybody else. The point is that the marked money was found on him, and there is no doubt that it came to him directly from Seretta on any view of the evidence, either as payment for narcotics or the payment of a gambling debt.

■ We find that the marked money given to Seretta on September 21 in exchange for cocaine was evidence that the jury could

properly consider on the question of whether appellant did participate in the sale of cocaine with Seretta on October 1, as charged in the indictment.

■ The next question is whether the evidence should have been excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed.R.Evid. 403. Balancing probative value against prejudicial impact is not a mechanical operation. *See* Advisory Committee Notes, Fed.R.Evid. 404(b). Broad discretion is vested in the trial judge to determine whether the evidence of prior conduct, although relevant, is unduly prejudicial. *United States v. Czarnecki,* 552 F.2d 698 (6th Cir. 1976). In this circuit, the test is whether unfair prejudice substantially outweighs its probative value. *United States v. Hopkinson,* 492 F.2d 1041, 1043 (1st Cir. 1974); *United States v. Barrett, supra,* 539 F.2d at 248. *See United States v. Viruet,* 539 F.2d 295, 297 (2d Cir. 1976).

■ Moreover, any prejudice was considerably diminished by the judge's limiting instructions at the time the evidence was admitted and in his charge to the jury. We conclude, therefore, that the evidence was properly admitted.

II. *Whether There Should Have Been a Mistrial.*

Appellant argues that the specific mention by the prosecution in his opening statement that a revolver was found partially protruding from the passenger's side of the car appellant was using necessitated a mistrial, particularly since the gun charge (Count III) was dismissed. This statement and the court's reading of the entire indictment, including Count III, to the jury was, appellant asserts, so prejudicial as to require a new trial.

At the start of the trial, defense counsel moved to suppress the use of the gun in evidence and asked that the prosecutor not be allowed to mention it in his opening. The district judge said that he would take care of the matter when it arose during trial, and the prosecution went ahead in his opening to outline the evidence on the gun charge (Count III) as well as on Count II. The matter arose when the government attempted to put into evidence the contents of the Mercury sedan, including the gun. The jury was excused from the courtroom while the question of the introduction of the gun into evidence was argued. After hearing argument, the court told appellant's counsel that if he made the proper motion, the gun count would be dismissed, which was done.

■ Appellant's claim of incurable prejudice is ill-founded and completely ignores the necessary process for the orderly trial of cases. The court could not be expected to postpone or delay the trial in order to explore the evidentiary basis of an indictment count, particularly since appellant's motion to suppress was not made until the day trial was commenced. Nor was it improper for the prosecutor to outline the evidence as to Count III in his opening statement. No claim is made that the opening was made in bad faith. *See United States v. Prieto,* 505 F.2d 8 (5th Cir. 1974). In fact, the prosecutor had a duty to outline the evidence fairly for each count in the indictment. The statement made as to the gun charge was: ". . . when he [Agent Sloboda] went over he opened the door of the car and on the front passenger seat he will tell you that he found a fully loaded .38 caliber Smith & Wesson revolver." There was no attempt here to poison the jury's mind against the defendant and recite highly questionable items of evidence. *See United States v. DeRosa,* 548 F.2d 464 (3d Cir. 1977).

The court explicitly stated, after reading the indictment, that it was not evidence of guilt and, in its final instructions, charged the jury that they were not concerned with the count that had been dismissed. It is hard to see what more could have been done. A defendant is not entitled to two trials, one before the judge to filter out inadmissible evidence and then a jury trial to determine guilt or innocence. Here, the

court, prior to the close of the government's case, heard argument outside the presence of the jury on the gun count and then dismissed it. Appellant actually got earlier consideration than he was entitled to under Fed.R.Crim.P. 29(a).[1]

Prejudice is a matter of degree. While we cannot say with certainty that there was none here, we note that whatever prejudice may have resulted from mention of the firearms count, it was insufficient to affect the jury's not guilty verdict as to the codefendant Giordano, even though the gun was found on his side of the car.

*The district court's denial of appellant's motion for a mistrial is affirmed.*

### III. *The Challenge to the Jury Panel.*

At the start of the trial, appellant objected to the composition of the jury panel on the grounds "that there are hardly any Italian jurors—the defendants being Italian—there are no black jurors, there are no minority jurors." He now asserts that it was error for the district court not to hold a hearing or "take some action regarding that claim."

While it is true that petit juries must be drawn from a source fairly representative of the community, there is no requirement that "juries actually chosen must mirror the community." *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). And, in any event, the issue of fair representation is not raised by a conclusory oral objection at the start of trial. Section 1867 of the Jury Selection Act, 28 U.S.C. § 1867, prescribes the method by which challenges to the selection procedure of juries may be made. Section 1867(e) states:

> The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal Crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title.

"Compliance with these express statutory requirements is necessary to question the validity of a plan adopted and approved pursuant to the Jury Selection and Service Act." *United States v. Jones,* 480 F.2d 1135, 1139 (2d Cir. 1973).

Appellant's useless attempt to challenge the jury panel on constitutional grounds did not even pay lip service to the Jury Selection and Service Act. The objection to the composition of the jury panel was without legal effect, and the district court was correct in denying it without more.

*Affirmed.*

---

1. ". . . The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. . . ."