UNITED STATES of America, Appellee,

v.

Moises BENMUHAR, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

William Pacheco NIEVES, Defendant, Appellant.

Nos. 80–1252, 80–1266.

United States Court of Appeals, First Circuit.

Argued May 4, 1981.

Decided Sept. 8, 1981.

Harvey B. Nachman, Santurce, P. R., for appellant Moises Benmuhar.

Carlos V. Garcia Gutierrez, Santurce, P. R., for appellant William Pacheco Nieves.

Mervyn Hamburg, Atty., Dept. of Justice, Washington, D. C., with whom Raymond L. Acosta, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before COFFIN, Chief Judge, GIBSON, Senior Circuit Judge,* CAMPBELL, Circuit Judge.

COFFIN, Chief Judge.

Appellants Moises Benmuhar and William Pacheco Nieves appeal from their criminal convictions. Both were indicted on a count that charged that they conspired with Benmuhar's cousin Charles Benmuhar and with Jose Barlia and Jesus Lazo to insure a Puerto Rican company, Delta International, Inc., for over $2 million. The count further charged that the conspiracy planned the successful destruction of Delta's warehouse by arson. The indictment claimed that the conspiracy violated 18 U.S.C. §§ 2, 371, 1341, 1343 and 1952.

* Of the Eighth Circuit, sitting by designation.

Appellant Benmuhar was also indicted, together with Charles Benmuhar and Jose Barlia, on three additional counts of mail fraud, 18 U.S.C. §§ 2 & 1341, and two additional counts of wire fraud, 18 U.S.C. §§ 2 & 1343. Each fraud count related to the same scheme described in the conspiracy count, but each involved a separate interstate communication with the insurance company, whose main offices were in New York and Massachusetts.

Charles Benmuhar was the "core figure" in the arson scheme, but he fled to Venezuela and has not yet been extradited. Jesus Lazo is still a fugitive. Appellants were tried with Jose Barlia. Appellants were convicted on all counts, while Barlia was acquitted.

## I. SUFFICING OF EVIDENCE

### A. BENMUHAR

■ Both appellants argued there was insufficient evidence to support their convictions. Viewing the evidence in the light most favorable to the government, *United States v. Ciampaglia*, 628 F.2d 632, 637 (1st Cir. 1980), we think there was sufficient evidence to permit a reasonable jury to find Benmuhar guilty beyond a reasonable doubt of both the conspiracy and the substantive mail and wire fraud counts.

Evidence that the jury could have believed showed that Benmuhar was an officer and sales manager of Delta International. Benmuhar's cousin Charles was Delta's president. When Delta's accountant informed Charles that Delta would be facing bankruptcy within months, Charles replied that he would prefer to destroy the company's warehouse than go through bankruptcy.

Charles hired contract arsonists to come from Florida. When they arrived, Charles gave them a tour of Delta's premises, pointing out the electrical controls and the sprinkler system, and introduced them to the appellant Benmuhar. The arsonists returned to Florida.

On their trip to Puerto Rico, the arsonists met with Charles and appellant Benmuhar.

One arsonist stated that he would "need some potassium chloride in order to be able to set the fire." Charles replied that he would have appellant Benmuhar drive the arsonists to a place to purchase the chemical. Appellant Benmuhar and the arsonists looked in a telephone book for a location for the purchase. Then the three drove there, and appellant Benmuhar walked in and bought the potassium chloride while the others waited in the car. The three then tried to locate some sulfuric acid. They located some after trying two more places. Appellant Benmuhar again purchased the chemical.

Later, all three assembled with Charles and others at the warehouse, poured drinks, and toasted to "the success of what was about to take place." The arsonists then prepared to light the fire while the others, including appellant Benmuhar, gathered by the exit. After igniting the blaze, the arsonists signaled and all left the building, which burned.

Appellant Benmuhar and Charles subsequently met with the claims adjuster for the insurance company with which Delta's fire insurance claim was filed. Both men participated in providing the insurance company with documents it requested during its investigation.

■ As this recital makes clear, the evidence is sufficient to establish that appellant Benmuhar joined an arson conspiracy, knowing of its essential and illegal character, and committed overt acts in its furtherance. The government may not have established that appellant Benmuhar knew every detail of the conspiracy, but this is not its burden. *E. g., United States v. McCarthy*, 611 F.2d 220, 222 (8th Cir. 1979), *cert. denied*, 445 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980).

■ The evidence similarly shows that appellant Benmuhar both directly and vicariously, *see Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed.2d 1489 (1946), participated in devising a scheme to defraud in which use of the mails and interstate telephoning would foreseeably follow

in the ordinary course of business. That appellant Benmuhar did not personally mail or telephone any communications makes no difference in this situation. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 361–62, 98 L.Ed. 435 (1954); *United States v. Calvert*, 523 F.2d 895, 903 (8th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *Bannister v. United States*, 379 F.2d 750, 752–53 (5th Cir. 1967), *cert. denied*, 390 U.S. 927, 88 S.Ct. 861, 19 L.Ed.2d 988 (1968).

### B. PACHECO

We similarly think that the evidence properly supported appellant Pacheco's conspiracy conviction. The proof at trial showed that at the time of the arson Pacheco was acting director of the Criminal Investigations Corps of the Puerto Rican Police, an office containing within it the arson investigation section. Pacheco had a long-standing social relationship with appellant Benmuhar, Charles, and at least one other Delta employee.

Pacheco intervened in the Delta arson investigation in a number of instances. Immediately after the fire, police refused to permit Charles to remove business documents from a fireproof room. Charles then asked an employee to call Pacheco at his home. Pacheco responded by coming to the scene and securing the documents released.

The day after the fire, Pacheco summoned a staff investigator on the case to his office, where Pacheco was meeting with three representatives from Delta. Before these potential arson suspects, Pacheco questioned the investigator about the progress of his work on the case. He responded that the matter was still under investigation. The investigator said at trial that such questioning of an investigator before potential suspects was unprecedented and at odds with the section's policy about public disclosure. He further testified that it was "very unusual" for persons affected by a fire "to immediately come to our office to know what is going on".

Pacheco made other unusual requests for inside information on the Delta investiga-

tion. About two months after the fire, he asked another investigator on the case "if [he] had any suspects, if [he] had any information. What would happen. What [he] found, and what [he] had relating to the investigation." Pacheco made three or four such inquiries of this investigator. The investigator stated that "[n]ever, never before" had Pacheco made such requests, nor was he able to recall any subsequent investigations about which Pacheco had so inquired.

Pacheco's superior also had observed Pacheco meeting with Delta employees after the fire. One of the men the superior knew only as "Mr. Benmuhar". The superior then ordered investigating agents to avoid disclosing information on the investigation to anyone, with specified exceptions that did not include Pacheco. One reason for his order was the fact that Pacheco had met with executives of the Delta Company after the fire. The superior testified that it was against policy to disclose information concerning investigations to persons who might be affected by the investigation.

About two months after the fire, Charles bought a new Pontiac car in Miami for about $6000 in cash. None of the sales documents bore Charles' name, although some *were* signed in the name of William Pacheco Nieves. The government handwriting expert could neither confirm nor exclude the possibility that Pacheco in fact had penned the signatures. The car was shipped to Pacheco in Puerto Rico, where it was registered under Pacheco's name until it was sold to a third party in 1979.

This evidence, although not overwhelming, is sufficient to support Pacheco's conviction. The jury could have found from the testimony that Pacheco attempted to take advantage of his official position to gain otherwise secret information about the progress of the Delta arson investigation. The unusual character of his meeting with potential defendants immediately after a suspected criminal event could create an inference that conspiratorial activity was afoot, and Pacheco's unprecedented interest in ascertaining the status of this investiga-

tion—manifested in one instance by improper questioning in the presence of potential suspects—could support the accompanying inference that Pacheco intended to relay this information directly or indirectly to his coconspirators. Although the government's failure to prove that Pacheco succeeded in obstructing the investigation weakens its case, this does not conclusively rebut the foregoing inferences since the jury could have believed that Pacheco would have done more, but for the evident vigilance and caution of his superior. Finally, Charles' apparently surreptitious purchase of the car in Pacheco's name provides a credible motive for Pacheco's involvement in the conspiracy. The government therefore produced substantial evidence from which the jury could have concluded that Pacheco, a high police official, undertook unusual and improper actions for the benefit of potential arson suspects during the course of an arson investigation in consideration for an apparently improper and secret gift. We cannot say that no reasonable jury could have concluded from this that Pacheco was guilty beyond reasonable doubt of knowing participation in the conspiracy to defraud Delta's insurers.

## II. DOUBLE JEOPARDY

██ Appellant Benmuhar argues that his conspiracy conviction violated the double jeopardy clause of the Fifth Amendment. He points out that he was previously charged with arson, 33 L.P.R.A., § 1561, and destruction of an insured building, *id.,* § 1902, under Puerto Rican law, and that these charges were dismissed after preliminary hearing for lack of sufficient evidence. Even assuming that these substantive counts amount to the same crime as con-

spiracy, *but see Illinois v. Vitale,* 447 U.S. 410, 415–16, 100 S.Ct. 2260, 2264–65, 65 L.Ed.2d 228 (1980); *Harney v. United States,* 306 F.2d 523, 531 (1st Cir.), *cert. denied,* 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171 (1962), and that federal double jeopardy protection attaches before the jury is sworn, *but see Crist v. Bretz,* 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978), no double jeopardy immunity bars the federal conspiracy conviction; a single act can violate both state and federal law and can thus create two separate offenses. *See, e. g., United States v. Wheeler,* 435 U.S. 313, 317, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). The reference to the state law crime of arson in 18 U.S.C. § 1952(b) does not alter this analysis since it is clear that Congress intended that violations of § 1952 would be crimes distinct from the substantive state law offenses that § 1952(b) lists for definitional purposes.[1] *See* H.R.Rep.No.966, 87th Cong., 1st Sess. 2, *reprinted in* [1961] U.S.Code Cong. & Ad.News 2664, 2665 ("[T]his bill . . . will not preempt the area covered by it. Those violations of State law . . . will be subject to State and local prosecution by State and local authorities. Nothing in this bill is to be construed as immunizing any violator of State law from State prosecution.") *See also United States v. Malatesta,* 583 F.2d 748, 757–58 (5th Cir. 1978), *aff'd en banc in relevant part,* 590 F.2d 1379 (5th Cir.), *cert. denied,* 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979); *United States v. Cerone,* 452 F.2d 274, 286–87 (7th Cir. 1971), *cert. denied,* 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972).

## III. JURY SELECTION

Appellant Benmuhar also claims that the jury selection process in this case violated

---

1. "§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises

   (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

   .    .    .    .    .

   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

   (b) As used in this section "unlawful activity" means . . . *arson* in violation of the laws of the State in which committed or of the United States" [emphasis added].

his Sixth Amendment right to a jury comprised of a fair cross section of the community. He argues that Puerto Rico's requirement that jurors be proficient in English tends to exclude various categories of jurors. Although we found such exclusion to be permissible in *Miranda v. United States,* 255 F.2d 9, 16–17 (1958), appellant urges a different result based on the recent decision of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). *Duren* approaches claims of unconstitutional jury disproportionality by placing the burden of establishing a prima facie case on the defendant, who must show

> "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364, 99 S.Ct. at 668.

Appellant claims that various "distinctive" groups are either overrepresented or underrepresented on impanelled juries in comparison with their proportion of the Puerto Rican population.[2] We assume without deciding that all these groups are "distinctive", and that the asserted percentage differences show that jury representation of these groups is not fair and reasonable.

█ In next considering whether appellant has demonstrated that these deviations are due to "systematic exclusion" in the jury-selection process, we observe that the only "systematic" characteristic that he explains is Puerto Rico's exclusion of potential jurors who cannot "read, write, or understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form" or who cannot "speak the English language." 28 U.S.C. § 1865(b)(2) & (3).[3] We hold that appellant satisfactorily demonstrates that the English proficiency requirement does operate in a "systematic" manner. *See Duren,* 439 U.S. at 366–67, 99 S.Ct. at 669–70. We limit our inquiry to this one factor, however, since appellant does not suggest that other unspecified factors operate in a systematic fashion so as to cause jury disproportionality.

The government seeks to rebut the assumed prima facie case by showing that "a significant state interest [is] manifestly and primarily advanced" by English proficiency requirement. *Id.* at 367, 99 S.Ct. at 670. The interest is that of having a branch of the national court system operate in the national language. This interest is precisely tailored to the jury exclusion criterion, so there is no question that the interest is "manifestly and primarily advanced" by the requirement. The only question therefore is whether the national language interest is "significant".

When the government's interest is properly characterized in such broad terms as assuring that national courts are conducted in the national language,[4] we believe it can

---

2. Appellant identifies nine groups that he maintains are "distinct": residents of the San Juan area; women; professional/managerial/white collar workers; industrial/farming/fishing workers; unemployed/retired/housewives; individuals with 8th grade educations or less; individuals with more than high school education; whites; and blacks.

3. Appellant in a sworn statement states that Puerto Rico randomly selected 60,000 names from voter registration lists and divides those into 30 lists of 2000 each. Seven of these lists were chosen at random and juror questionnaires were sent to the 14,000 persons. Of the 8505 responses, "nearly half" were eliminated "for lack of sufficient knowledge of the English

language", two were eliminated because they were improperly filled out, and 1924 were eliminated "for other factors." The total number of names placed in the qualified jury wheel was 2137. Eighteen percent of the qualified jurors were then eliminated at the impanelling stage.

Appellant explains neither the precise content nor the exact manner of operation of the English proficiency requirement.

4. Appellant states that "both the English language and adequate representation could be achieved" and elaborates only by asserting that "[i]f English is to be preserved as the language of the federal court in Puerto Rico, something must be put back into the system to make it representative and constitutional." Had the

be fairly described as significant. Federal district courts in part are designed to provide trial alternatives for litigants, resident and nonresident, who seek the uniformity, expertise, and familiarity that they believe they may find in a national rather than a local forum. Primary use of the national language is both symbolically and functionally significant in achieving this goal. Nonresident citizens who do not speak Spanish may use the Puerto Rican federal district court without unusual requirements. The Attorney General of the United States may appear personally or by representative without being limited by considerations of fluency in Spanish. Other judges may sit by designation as needed without regard to their ability in Spanish. Possible translation distortions in indictments and complaints based on statutes written in English are avoided, as they are again during appellate review. *See generally United States v. Valentine*, 288 F.Supp. 957, 964–65 (D.P.R. 1968).

■ We consequently decide that the national language interest is significant. Appellant therefore was not denied a representative jury in violation of the Sixth Amendment. We note that this judgment is a narrow one. It expresses no opinion as to the ability of Congress to achieve different results through legislation or as to a case in which the appellant identified and the government did not respond to policy accommodations that could achieve the national language interest without the need for such an English proficiency requirement for jurors.

## IV. OTHER ISSUES

■ We deal finally—and briefly—with several other objections. Both appellants complain that the district court improperly

appellant suggested some concrete means of reconciling the national language interest with a jury selection system with a lesser impact on jury representation, we would have expected some reply from the government. As the record now stands, however, there is absolutely no discussion of the feasibility of administrative or technological options that could satisfy the government's interest without imposing the English proficiency requirement upon jurors.

limited supplemental instructions read in response to the jury's twice-repeated request that "the definition of conspiracy" be repeated. The court replied by reciting section 28.04 of Devitt & Blackmar's Federal Jury Practice and Instructions, which it had previously included as part of its general instruction on conspiracy. Appellants requested that two additional parts also be reread, to define the term "specific intent" and to explain that "[m]ere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that defendants aided and abetted a crime, unless you [the jury] find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator." They did not request that other, less favorable portions of the lengthy conspiracy instruction be repeated. The judge denied appellants' request on the grounds that the jury asked only for the definition of, not the entire instruction on, conspiracy; that the basic conspiracy definition he proposed to read covered the additional material upon which appellants sought elaboration; and that to grant appellants' request would be to emphasize unduly one portion of the total conspiracy instruction. We cannot fault this reasoning. *See, e. g., United States v. Chatham*, 568 F.2d 445, 451 n.10 (5th Cir. 1978); *Whiting v. United States*, 321 F.2d 72, 75 n.3 (1st Cir.), *cert. denied*, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963).

■ Appellant Benmuhar's consecutive sentencing under the first conspiracy count and the second mail fraud count did not violate *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 U.S. 306 (1932). The first count required the government to prove that appellant agreed to join a con-

We do not believe that the government has the burden under *Duren v. Missouri*, 439 U.S. 357, 367–70, 99 S.Ct. 664, 670–71, 58 L.Ed.2d 579 (1979), of demonstrating the unavailability or impracticality of alternative policy accommodations when we find its general national language interest to be significant and when the appellant has not suggested any even generally promising avenues of inquiry.

spiracy involving the foreseeable use of the mails, while the second count did not. *See Iannelli v. United States*, 420 U.S. 770, 777 n.10, 95 S.Ct. 1284, 1289 n.10, 43 L.Ed.2d 616 (1975). The second count required the government to prove that appellant aided in causing the use of the mails for purposes of executing a scheme to defraud, while the first count did not. *See, e. g., Harney v. United States*, 306 F.2d 523, 531 (1st Cir.), *cert. denied*, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 1171 (1962). The government's proof was sufficient with respect to each of these distinctions.

■ Neither was it error to convict appellant for separate mail and wire fraud violations on the basis of different telephone and mail communications, even though there was but a single fraudulent scheme. *E. g., United States v. Moss*, 631 F.2d 105, 106–07 (8th Cir. 1980).

*Affirmed.*