**UNITED STATES of America, Appellee,**

v.

**Rene M. PION, Defendant, Appellant.**

**No. 93–1193.**

United States Court of Appeals,
First Circuit.

Heard Jan. 6, 1994.

Decided June 1, 1994.

---

**20**

Benjamin D. Entine, Salem, MA, for appellant.

Geoffrey E. Hobart, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and George W. Vien, Asst. U.S. Atty., Boston, MA, were on brief for appellee.

Before TORRUELLA, Circuit Judge, ALDRICH, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

After a two-week trial, Rene Pion was convicted on three cocaine-related charges and sentenced to concurrent mandatory minimum ten-year prison terms, pursuant to 21 U.S.C. § 841(b)(1)(A)(ii).[1] We address each of Pion's appellate claims.

## A. *Entrapment*

Without challenging the jury instruction on entrapment, Pion contends that the evidence compelled jury acceptance of his entrapment defense. We therefore inquire whether a rational jury could have found, beyond a reasonable doubt, either that he was predisposed to commit the particular crime charged *or* that the government did not induce him to commit it. *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992); *United States v. Reed,* 977 F.2d 14, 18 (1st Cir.1992). Viewed in the light most favorable to the verdict, *United States v. Martinez,* 922 F.2d 914, 923 (1st Cir.1991), there was ample evidence that Pion was not induced to commit any crime.

The only inducement to which he points on appeal is that the government informant, Esteban Mendoza, plied and enticed him with a "vital" supply of El Presidente beer for resale at Pion's restaurant. According to Pion, the government thus subjected him to "rigid economic coercion" to traffick in cocaine. Not only was this fanciful claim not preserved below, it is squarely contradicted by his testimony at trial. Additionally, the El Presidente beer Mendoza supplied Pion totalled nine cases; none of it delivered until more than two weeks after he unhesitatingly indicated his willingness to supply Mendoza with the first one-half kilogram of cocaine. Thereafter, Pion participated in a three-kilogram transaction (and agreed to arrange another three kilograms) with no inducement except the implicit "promise" of cocaine profits. Thus, the record reveals ample support for a jury finding that Pion was no "unwary innocent" but an " 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988).

## B. *Coconspirator Statements*

Pion claims that the district court committed reversible error by admitting into

---

1. Count I charged conspiracy to possess cocaine, with intent to distribute, *see* 21 U.S.C. § 846; substantive counts II and III charged possession of cocaine for distribution, and distribution of cocaine, respectively, *see id.* §§ 841(a)(1) & (b)(1)(A)(ii).

evidence coconspirator statements pertaining to two separate conspiracies: the first involving a one-half kilogram transaction on June 4, 1991; the second a three-kilogram transaction on July 3.[2] According to Pion, the only possible link between the two transactions was the red Honda automobile driven on June 4 by coconspirator "Rafael," purportedly Pion's cocaine supplier, and by coconspirator Christobalina Tejada on July 3. Since Pion does not suggest that the district court departed from the procedure required under *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977), and *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), we review the conspiracy finding for clear error, *United States v. McCarthy*, 961 F.2d 972, 977 (1st Cir.1992). We find none.

The government quite correctly suggests that the red Honda, registered to Tejada, was the "most obvious piece of circumstantial evidence" linking the two transactions to the same conspiracy. Equally conspicuous, however, yet overlooked by Pion, were the three participants common to both transactions, notably himself, "Rafael" and Tejada, and their tacit agreement to traffick in cocaine. Nothing more was required.

### C. *The Transcripts*

Without identifying the translations at issue, Pion challenges, as ambiguous and inaccurate, government transcripts containing English translations of Spanish conversations recorded by Mendoza, the government informant, during various meetings with Pion and other conspirators. Since Pion did not argue before the district court that the transcripts were *ambiguous*, we review only for plain error. *See United States v. Mejia–Lozano*, 829 F.2d 268, 272 (1st Cir.1987); Fed. R.Crim.P. 52(b).

■ Even though Pion's failure to identify the challenged statements severely hinders review, especially since the transcripts are not included in the appellate record, *see* Fed.

R.App.P. 10(b), 11(a), we can say with confidence that there was no error, plain or otherwise. The thrust of this contention is that the transcripts are susceptible to two radically different interpretations: one innocent (the recorded conversations merely concerned beer); the other criminal (cocaine trafficking). The record precludes any suggestion of error based on this newly minted theory, as the evidence (including Pion's testimony) and the recorded conversations themselves established beyond doubt that beer was simply the means Mendoza used to gain access to Pion.

■ The district court correctly followed the transcript-admission procedure set out in *United States v. Rengifo*, 789 F.2d 975 (1st Cir.1986), by first attempting, without success, to obtain a stipulated transcript. *See id.* at 983. After Pion objected to alleged inaccuracies in the authenticated government transcript, he *consented* to its admission subject to the right to introduce his own transcript. The court thereupon admitted the government transcript and gave a cautionary jury instruction. Notwithstanding the fact that the court recognized his right to do so, Pion did not offer his own transcript. Later, Pion objected when the government attempted to read portions of its transcript to the jury. The court treated the objection as a motion to strike, and denied it.

There was no abuse of discretion. *United States v. Font–Ramirez*, 944 F.2d 42, 48 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 954, 117 L.Ed.2d 122 (1992) (no "abuse of discretion" where defendant neither offered transcript nor indicated specific inaccuracies in government transcript); *accord United States v. Devous*, 764 F.2d 1349, 1355 (10th Cir.1985).

### D. *Juror Misconduct*

■ The district court's decision to conduct an *in camera* inquiry to resolve a report of improper juror contact was well within its broad discretion. *See United States v. Reis*, 788 F.2d 54, 59 (1st Cir.1986). The tran-

---

**2.** Pion's entire effort to identify the challenged coconspirator statements is as follows: "The admission of alleged co-conspirators [sic] statements from the second conspiracy against Pion, in order to purportedly prove his involvement in the alleged first conspiracy, and vice-versa, was therefore error and was irreparably prejudicial to Pion."

script of the *in camera* interview plainly reveals that the matters discussed directly pertained to whether the juror had been approached and whether he could be impartial.

### E. *Jury Composition*

Pion claims a deprivation of his constitutional right, under the Sixth Amendment to the United States Constitution, to be tried by a petit jury drawn from a representative cross section of the community.[3] *See Taylor v. Louisiana,* 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975). The district court accepted, *arguendo,* Pion's statistical data indicating that though the 1990 census reflects that 4.2% of the residents within the Eastern Division of the District of Massachusetts are Hispanic, only 0.99% of all persons responding to the juror questionnaire during 1992, and 0.80% of those appearing for juror orientation, were Hispanic. These data form the evidentiary base for Pion's sweeping claim that "Hispanic minority members are so grossly underrepresented among federal juries as to constitute a 'systematic exclusion of the group in the jury-selection process'" (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)). The district court rejected the Pion claim on

the fundamental ground that the Amended Jury Plan for the District of Massachusetts ["Jury Plan"] is as broadly inclusive as any in the nation and has been expressly approved under the Federal Courts Administration Act of 1992, codified at 28 U.S.C. § 1863(b)(2) (1992).[4] On appeal, Pion nonetheless insists that the Jury Plan *results in* such substantial Hispanic underrepresentation as to render it constitutionally infirm under the "systematic exclusion" standard employed in *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

The burden is on the defendant to establish a prima facie case of unconstitutional disproportionality. *United States v. Benmuhar,* 658 F.2d 14, 19 (1st Cir.1981). We conclude that Pion has not demonstrated that any Hispanic underrepresentation on his jury venire was due to their *"systematic exclusion in the jury-selection process." Id.* 439 U.S. at 366, 99 S.Ct. at 669 (emphasis added). Consequently, he has failed to establish a prima facie violation of the "fair-cross-section requirement." *Id.* at 364, 99 S.Ct. at 668; *United States v. Hafen,* 726 F.2d 21, 23 (1st Cir.), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984).

The government agrees that Hispanics constitute a distinctive ethnic group in the

---

**3.** We do not share the view embraced by our brother, relating to 28 U.S.C. § 1867. *See infra* at pp. 25–28. First, it is unnecessary to address section 1867, because the merits dispute properly raised, briefed and argued by the parties, and carefully considered by the district court, presents an insurmountable barrier for appellant. *See, e.g., Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775–76, 49 L.Ed.2d 672 (1976); *In re Unanue Casal,* 998 F.2d 28, 33 (1st Cir. 1993). Second, the jurisdictional question our brother poses is anything but easy, having been squarely addressed in its present aspect by but one court of appeals, *see United States v. De Alba–Conrado,* 481 F.2d 1266 (5th Cir.1973), which concluded—contrary to the position taken in the concurring opinion—that *constitutional* challenges to jury composition are *not* barred by 28 U.S.C. § 1867(e). *Id.* at 1270, n. 4. Although we take no position on the jurisdictional question, the difficulty with the position espoused by our brother is succinctly stated in the legislative history of 28 U.S.C. § 1867(e):

Subsection (e) makes clear that the procedures prescribed in this section are the exclusive means *for challenging compliance with the statute.* The *bill,* as amended by the committee,

however, *makes clear that the act will not preclude any person or the United States from asserting rights created by other statutes or for* [sic] *enforcing constitutional rights.*

H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News 1792, 1806 (emphasis added). *See also De–Alba–Conrado,* 481 F.2d at 1270 n. 5.

Given the express language employed in subsection 1867(e), and its explicit legislative history, *id.,* we believe it prudent to bypass the question, *see Norton,* 427 U.S. at 532, 96 S.Ct. at 2775–76, rather than attempt, *sua sponte,* to resolve it on the present record.

**4.** Rather than voter lists or motor vehicle registration lists, the baseline data utilized under the Jury Plan are the alphabetical lists of all persons age seventeen and above residing in every Massachusetts city and town, compiled annually pursuant to Mass.Gen.L. ch. 234A, § 10 (1992). *See* United States District Court, District of Massachusetts, Amended Jury Plan at 3 (Sept. 6, 1989). Names are drawn at random from these resident lists for inclusion in the Master Jury Wheel from which potential grand and petit jurors' names are then randomly drawn.

Eastern Division of the District of Massachusetts, thus conceding the first prong of the three-part *Duren* test. *See Duren*, 439 U.S. at 364, 99 S.Ct. at 668. The government counters, however, that Pion failed to make the two other *Duren* showings: that Hispanic representation on jury venires "is not fair and reasonable in relation to the number of such persons in the community" and that any such underrepresentation is "due to systematic exclusion of [Hispanics] in the jury-selection process." *Id.* Although both showings are problematic, we need address only the "systematic exclusion" claim.

Pion presented uncontroverted evidence indicating a 3.4% "absolute disparity" between the 4.2% Hispanic representation in the relevant general population and the 0.80% Hispanic representation among persons appearing for juror orientation. *See Hafen*, 726 F.2d at 24 ("absolute disparity" standard more appropriate than "comparative disparity" standard where allegedly underrepresented group constitutes very small proportion of the total population) (citing *United States v. Whitley*, 491 F.2d 1248, 1249 (8th Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974)).[5] For the reasons stated in *Hafen*, 726 F.2d at 24, the "comparative disparity" standard should not be employed in circumstances where "a small variation in the figures used to calculate comparative disparity can produce a significant difference in the result, and ... there is reason to doubt the accuracy of the figures on which appellant would have us rely."[6]

Pion has not demonstrated that any alleged Hispanic underrepresentation on East-

ern Division jury venires in the District of Massachusetts is due to "systematic exclusion in the jury-selection process." *Duren*, 439 U.S. at 366, 99 S.Ct. at 669. He identifies neither a systemic defect nor an operational deficiency in the Jury Plan which would account for the alleged underrepresentation, *compare id.* at 366–67, 99 S.Ct. at 669–70, and he expressly disavows any suggestion that the Jury Plan was either designed or intended to exclude Hispanics.

The first infirmity in the unfair cross-section claim is that the district court found, and Pion does not dispute, that the broadest data available—resident lists—are used to make up the Master Jury Wheel from which Eastern Division jury venires are drawn. There is no allegation, much less a showing, statistical or otherwise, that data more conducive to a fair cross section are available, let alone more fairly representative of eligible Hispanics in the relevant general population. Second, since the names included in the Master Jury Wheel are randomly drawn from the most inclusive data available, and random selection also determines to whom juror questionnaires are mailed, there can be no reasonable inference that the jury-selection process itself systematically excludes Hispanics at any stage up to and including the distribution of juror questionnaires.

At that stage in the process, however, the data relied on by Pion indicate, *see* 1992 Jury Wheel Report, Eastern Division, Boston, Mass., that only .99% of those who complete and return the jury questionnaire, and .80% of those who appear for juror orientation, are Hispanic. Nevertheless, even assuming their

---

**5.** The *"comparative* disparity" standard would measure the percentage spread between the total number of Hispanics in the relevant general population who are eligible for jury service ["eligible Hispanics"], *i.e.*, assumedly 4.2%, and the *shortfall* between the eligible Hispanic jurors (4.2%) and the percentage appearing for juror orientation (0.8%), *i.e.*, 3.4%. The *"comparative* disparity" would be calculated by dividing the *shortfall* in Hispanic representation (3.4%) by the percentage of eligible Hispanics (4.2%), yielding a huge 81% "comparative disparity." *See Hafen*, 726 F.2d at 23.

The *"absolute* disparity" standard, on the other hand, would measure the gross spread between the percentage of eligible Hispanics (4.2%) in the relevant population and the percentage of His-

panic representation on the Master Jury Wheel. Here, Pion *wrongly assumes* a 3.4% "absolute disparity." The reality is that the *spread* between the 4.2% of eligible Hispanics and the *percentage of Hispanics on the Master Jury Wheel* has not been established, nor can it be discerned, since the percentage of Hispanics on the *Master Jury Wheel* is not disclosed in the appellate record. Thus, Pion impermissibly assumes that the 0.80% Hispanic representation among all persons who appear for juror orientation is the appropriate downside percentage for measuring the absolute disparity in Hispanic representation.

**6.** For a fuller exposition of the rationale for utilizing the "absolute disparity" standard in a case of this sort, see *Hafen*, 726 F.2d at 23–24.

**24**

accuracy, these data demonstrate *no Hispanic underrepresentation on the 1992 Master Jury Wheel.* And since only those persons whose names are randomly drawn for the Master Jury Wheel can receive a juror questionnaire (and, later, a summons to juror orientation), Pion's allegation of "systematic exclusion" based on the .80% Hispanic representation at juror orientation (or the .99% responding to the questionnaire) is *pure speculation. See United States v. Garcia,* 991 F.2d 489, 492 (8th Cir.1993) (numerical underrepresentation not a proxy for systematic exclusion); *cf. Barber v. Ponte,* 772 F.2d 982, 997 (1st Cir.1985) (en banc) ("courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not actively prevent people from serving or actively discriminate, and so long as the system is reasonably open to all") (emphasis in original); *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986); *Benmuhar,* 658 F.2d at 19 (finding "systematic exclusion" of Hispanics as a result of Commonwealth of Puerto Rico's exclusion of non-Anglophones from jury service). With no datum as to Hispanic representation on the Master Jury Wheel, and given the fact that the baseline data for comprising the Master Jury Wheel are the best available, there can be no reasonable inference that the relatively small Hispanic underrepresenta-

tion at juror orientation is attributable to anything other than the randomness of the draw from either the resident lists or the Master Jury Wheel. Consequently, Pion generated no trialworthy issue on the essential element of "systematic exclusion," *Duren,* 439 U.S. at 366, 99 S.Ct. at 669.[7]

### F. Mandatory Minimum Sentence (21 U.S.C. § 841(b)(1)(A)(ii))

■ Pion contends that the sentencing court improperly included an unconsummated three-kilogram cocaine transaction in calculating the amount for which he was responsible, thereby triggering the minimum ten-year sentence mandated by 21 U.S.C. § 841(b)(1)(A)(ii) (ten-year minimum for distribution of five or more kilograms of cocaine).[8] At sentencing, the government argued that Pion was responsible, under U.S.S.G. § 2D1.1 comment. (n. 12) (1992) [hereinafter: "note 12"], for the additional three kilograms he negotiated to supply Mendoza in July.[9] The court determined, pursuant to note 12, that Pion was not "reasonably capable of producing" the three additional kilograms.[10] Then it supportably found that the object of the conspiracy was to distribute in excess of six kilograms of cocaine, including the additional three kilograms Pion agreed to supply Mendoza later in July.[11] Accordingly, the court concluded

---

7. *Duren* provides an instructive contrast. There a very large (39%) *absolute disparity* existed between the percentage of women in the relevant population and their representation on jury venires, a disparity which the Court found reasonably attributable to a prominent feature in Missouri's jury-selection process; that is, the longstanding *practice* of granting women *automatic exemption from jury service upon request. Duren,* 439 U.S. at 366–67, 99 S.Ct. at 669–70. Pion points to nothing in the Jury Plan, or its implementation, which would account for the much smaller (3.4%) absolute disparity alleged here.

8. The presentence report recommended that Pion be held responsible for 3.5024 kilograms, the combined total delivered on June 4 (approximately one-half kilogram) and July 3 (three kilograms).

9. Note 12 states in relevant part:

The weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to pro-

duce *and* was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce *and* was not reasonably capable of producing.
(Emphasis added.)

10. The district court ruled:

I am *unable to find* by a fair preponderance of the evidence *that Mr. Pion was reasonably capable of producing the negotiated amount.* I've already found that he intended to produce it. But on this record, and by this record I include the presentence report and all the representations made to me, I can not find that he was reasonably capable of producing the negotiated amount.
(Emphasis added.)

11. The court found—

by a fair preponderance of the evidence [that Pion] knowingly, intelligently and voluntarily entered into a course of conduct the negotia-

that Pion was subject to the ten-year minimum sentence mandated by statute for conspiring to possess and distribute five or more kilograms of cocaine. *See* 21 U.S.C. §§ 841(b)(1)(A)(ii), 846. Relying on the finding that he was not capable of producing the three additional kilograms negotiated on July 3, *see supra* note 10, Pion argues that the ten-year minimum sentence mandated under 21 U.S.C. § 841(b)(1)(A)(ii) does not apply. We disagree.

Pion's position is confounded by the fact that note 12 is phrased in the conjunctive. *See supra* note 9. It requires the sentencing court to include the "weight under negotiation in an uncompleted distribution" unless it finds that "the defendant did not intend to produce *and* was not reasonably capable of producing the negotiated amount." *Id.* (emphasis added). Furthermore, note 12 directs the sentencing court—once again in the conjunctive—to "exclude from the guideline calculation the negotiated amount that it finds the defendant did not intend to produce *and* was not reasonably capable of producing." *Id.* (emphasis added). Its conjunctive phrasing clearly is intended to avoid inflated sentences based on drug-quantity discussions in uncompleted transactions where the defendants were merely puffing; that is, where the defendants did not intend, *and* were unable, to produce the amount under discussion. *Cf. United States v. Moreno*, 947 F.2d 7, 9 (1st Cir.1991) (applying former U.S.S.G. § 2D1.4 comment. (n. 1)). In sum, Pion's claim fails because neither conjunctive clause in note 12 can be ignored.[12]

Although the district court did not find Pion reasonably capable of producing the additional three kilograms, it found that he was a member of a conspiracy whose object was to distribute more than six kilograms

and that he specifically intended to further the conspiratorial objective. *See United States v. Pennell*, 737 F.2d 521 (6th Cir.1984) (no "impossibility" defense available under §§ 841(a)(i) and 846); *United States v. Everett*, 700 F.2d 900, 904 (3d Cir.1982) (Congress intended to eliminate "impossibility" defense under § 846); *see generally* Wayne R. La-Fave & Austin Scott, Jr., 2 *Substantive Criminal Law* § 6.5(b), at 90–93 (1986) (discussing limits of "impossibility" defense in conspiracy cases).

The district court correctly concluded that Pion's inability to produce the additional three kilograms was no impediment to its imposition of the ten-year minimum sentence mandated by statute.[13]

*Affirmed.*

TORRUELLA, Circuit Judge (Concurring).

Although I agree with my colleagues on all parts of this well-crafted opinion, with the exception of Part E thereof—and even as to that, I conclude that appellant has failed to raise a cognizable claim before this court—I must express myself separately with respect to the substance of the majority's reasoning in reaching our common result.

First of all, the court has reached issues and made pronouncements thereon, which are not properly before us. I am referring to appellant's allegation that the jury pool from which the petit jury was drawn does not represent a cross-section of the community, thus violating the Sixth Amendment of the Constitution. *See, Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

This contention was raised by appellant, *after* conviction, as part of a supplemental

---

tion for which was and which contemplated the delivery of an additional three kilograms, or 3,000 grams of cocaine within the following week. . . .

**12.** Although the parties assume that the drug-quantity determination arrived at under note 12 does not govern for purposes of triggering a minimum sentence mandated by statute ["MMS"], *see, e.g.*, 21 U.S.C. § 841(b)(1)(A)(ii), note 12 is not limited in this fashion. Nor is there a statutory directive that might be thought to govern the threshold drug-quantity determina-

tion for MMS purposes. Absent a statutory alternative, therefore, we think application note 12 provides the *threshold* drug-quantity calculus upon which depends the statutory minimum sentence fixed under 21 U.S.C. § 841(b)(1)(A)(ii). *See United States v. Hughes*, 970 F.2d 227, 236 n. 9 (7th Cir.1992) (discussing U.S.S.G. § 2D1.4, a forerunner to U.S.S.G. § 2D1.1 comment. (n. 12) (1992)).

**13.** Since there has been no showing of error, Pion's cumulative-error claim collapses.

motion for a new trial. It therefore clearly fails to comply with the provisions of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861–1876, pursuant to which:

> In criminal cases, [challenges to the composition of the jury must be raised] before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds [for such a challenge] ...

28 U.S.C. § 1867(a). This statute further establishes that:

> The procedures prescribed by this section *shall* be the *exclusive* means by which a person accused of a federal crime, ... may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title.

28 U.S.C. § 1867(e) (emphasis added).

The government's apparent lapse in not challenging appellant's failure to comply with these mandatory requirements, and the district court's complacency therewith, are irrelevant to determining whether the issue is properly before us. The jury challenge requirements are to be strictly construed and failure to comply precisely with their terms forecloses any challenge to the composition of the jury. *United States v. Cooper*, 733 F.2d 1360 (10th Cir.1984), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *United States v. Green*, 742 F.2d 609 (11th Cir.1984); *United States v. Raineri*, 670 F.2d 702 (7th Cir.1982), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); *United States v. Bearden*, 659 F.2d 590 (5th Cir.1981), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1981); *United States v. Young*, 570 F.2d 152 (6th Cir.1978); *United States v. D'Alora*, 585 F.2d 16 (1st Cir.1978); *Government of Virgin Islands v. Navarro*, 513 F.2d 11 (3d Cir.1975), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 698 (1975); *United States v. Fernández*, 497 F.2d 730 (9th Cir.1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1974). Any objection to jury composition which is not timely raised is considered waived for all purposes. *United*

*States v. Webster*, 639 F.2d 174 (4th Cir. 1981), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Young, supra; United States v. Grismore*, 546 F.2d 844 (10th Cir.1976).

The record shows that appellant failed to raise the jury composition issue in a timely fashion,[1] and thus, as a matter of law, he is foreclosed from the right to contend this matter on appeal. We therefore need go no further. Yet we do, and I am thus required to express my disagreement with the majority's unnecessary dicta regarding the merits of this issue.

As is well known, to establish a prima facie violation of the cross-section requirement, a petitioner must show: (1) that the group alleged to be excluded is a "cognizable" or "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation in petitioner's venire is due to the systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Hernández v. Texas*, 347 U.S. 475, 479, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954).

There should be little doubt regarding the cognizability of Hispanics for Sixth Amendment purposes. *See Hernández v. Texas*, 347 U.S. at 475, 74 S.Ct. at 667; *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985–86, 90 L.Ed. 1181 (1986). Where I part company with my colleagues is in our relative application of the second and third *Duren* prongs.

In my view, in contrast with the majority, the figures presented by appellant show a statistically significant underrepresentation of Hispanics within the jury venire. According to the 1990 census, 4.2% of the residents within the Eastern Division of the District of Massachusetts, the relevant community, are Hispanics. Yet Hispanics represent only .80% of the venires for that Division. Otherwise stated, although the population composi-

---

**1.** There is no allegation that appellant was impeded from doing so for any valid reason, or that the information upon which his claim is based was unavailable.

tion is such that one would expect 42 Hispanics to serve on the district court's jury for every one-thousand citizens called to such duty, in fact only eight Hispanics serve in the venires for every one-thousand citizens called. Appellant further contends that when compared with other identifiable ethnic groups, such as non-minority whites, blacks or American Indians, only Hispanics are disproportionately underrepresented—and the statistics were produced to support this contention.

According to my calculations, if one takes the above figures as correct, Hispanics are underrepresented in the venire by 80.95% as compared to their numbers in the community.[2] *Duren v. Missouri, supra,* 439 U.S. at 364, 99 S.Ct. at 668. Such a disparity is not only statistically significant but also constitutionally cognizable. *Id.* My method of determining disparity is dubbed the "comparative disparity" standard by my colleagues, *ante* at 23 n. 5, which they understand should not be used "where [the] allegedly underrepresented group constitutes [a] very small proportion of the total population." *Id.* Citing *United States v. Hafen,* 726 F.2d 21, 23–24 (1st Cir.1984), they promote the so-called "absolute disparity" standard, *ante* at 23 nn. 5–6, whereby they conclude that the underrepresentation is only 3.4%,[3] a spread which is said to be constitutionally insignificant. *Hafen* tells us that this system of calculating disparity should be used where the cognizable group is small because if the "comparative disparity" method is used under those circumstances, it will distort "reality." *Hafen,* 726 F.2d at 24.

I believe this to be an erroneous conclusion for several reasons. First of all, I find *Hafen* to run contrary to prior, valid circuit precedent in *LaRoche v. Perrin,* 718 F.2d 500 (1st Cir.1983), which established the so-called comparative disparity calculation as the circuit standard for determining underrepresentation. *See also Barber v. Ponte,* 772 F.2d 982, 989 nn. 11, 12 (1st Cir.1985). *Hafen's* attempt to distinguish *LaRoche* is

unconvincing. Secondly, the majority's approach leaves us without any guide or standard as to when the cognizable group is to be considered too small or large so as to trigger the switch from one standard to the other. It would appear that applying different constitutional standards to varied groups, depending on whether they are large or small, would not only raise substantial equal protection issues, but would defeat the important goals promoted by the Jury Selection and Service Act and the Sixth Amendment. The minorities most in need of protection are those least entitled to it, to allegedly prevent a "distortion of reality." I might ask who's "reality" are we talking about? To my view, the true distortion of "reality" is the failure of a criminal law system, before which is tried a large number of persons from an ethnic group, to include within its mechanisms the peers of those charged, at least in some reasonable measured proportion to their membership in the population. Finally, on its face the so-called "absolute disparity" standard appears to run contrary to *Duren,* which speaks to "the representation of [the] group in the community ... in relation [i.e., in comparison] to the number of such persons in the community." *Duren, supra,* 439 U.S. at 364, 99 S.Ct. at 668. This language seems to speak in *comparative,* not in absolute, terms.

We thus come to the issue of systematic exclusion. Normally, systematic exclusion requires a showing of substantial disparity in numbers over a sustained period of time, *Barber v. Ponte,* 772 F.2d 982, 989 (1st Cir. 1985), something which has not been established by appellant in this case. I believe, however, that where the disparity established by the claimant reaches the proportion of those in the present case, *80.95%,* the burden must be shifted to require the government to justify that such an aberration is not the product of inappropriate conduct. In most cases, such as perhaps the present one, this

**2.** This percentage of underrepresentation is measured by calculating the *shortfall* between the percentage of eligible Hispanic jurors (4.2%) and the percentage appearing for juror orientation (0.8%), i.e., 3.4%, and then dividing the *shortfall*

in Hispanic representation (3.4%) by the percentage of eligible Hispanics (4.2%).

**3.** 4.2% − .8% = 3.4%.

should be a burden easily explainable by the government.

Had appellant complied with the absolute requirements of 28 U.S.C. § 1867, I would have voted for reversal of his conviction. Having failed to do so, however, I concur in the affirmance of his conviction, although as indicated above, I believe that at least part of the majority's reasoning is flawed.