UNITED STATES of America, Appellant,

v.

Fabian Carlos MUNIZ, Defendant, Appellee.

No. 94–1806.

United States Court of Appeals, First Circuit.

Heard Feb. 10, 1995.

Decided March 8, 1995.

Geoffrey E. Hobart, Asst. U.S. Atty., with whom Donald K. Stern, U.S. Atty., Boston, MA, was on brief, for United States.

John C. Doherty, Andover, MA, for appellee.

Before SELYA and BOUDIN, Circuit Judges, and CARTER,* District Judge.

SELYA, Circuit Judge.

For better or worse, the days are long since past when federal district judges wielded virtually unfettered discretion in sentencing criminal defendants. The sentencing guidelines are controversial—but they have the force of law and, therefore, command the allegiance of the courts. Judges, who enforce the laws when others transgress them, must be sensitive to their own responsibility not to be seen as placing themselves above the law. This case exemplifies the importance of that principle.

## I. THE ROAD TO ARREST

Because the underlying conviction resulted from a guilty plea, we draw the facts from the uncontested portions of the Presentence Investigation Report (PSI Report) and the transcript of the sentencing hearing.[1] *See United States v. Garcia,* 954 F.2d 12, 14 (1st Cir.1992); *United States v. Dietz,* 950 F.2d 50, 51 (1st Cir.1991).

All the events mentioned, including court proceedings, occurred in 1994 unless other-

---

\* Chief Judge, U.S. District Court for the District of Maine, sitting by designation.

1. In this case, much of the evidence is beyond hope of contradiction. The authorities tape-recorded the various telephone conversations in which the defendant participated and fitted the hotel room in which the denouement occurred with a video camera and a microphone.

wise specifically indicated. Early that year, agents of the federal Drug Enforcement Administration (DEA) arrested a married couple, Omer and Camille Belle, in the course of a narcotics investigation. The Belles soon began to peal; they told the federal agents that they had purchased kilogram quantities of cocaine from defendant-appellee Fabian Carlos Muniz on a steady basis for two years (most recently in December of 1993), and that Muniz also had made similar sales to at least two other individuals.

The Belles agreed to cooperate in a sting operation directed against Muniz. On February 4, Camille Belle called Muniz and informed him that a friend was interested in acquiring three to four kilograms of cocaine. Muniz replied that the quantity was "no problem" and quoted a price of $23,500 per kilogram. When Camille sought reassurance that the drugs would be forthcoming, Muniz reiterated that "as long as they got [the funds], it's not a problem."

Later that evening, Omer Belle called and told Muniz that the would-be buyer wanted to purchase five kilograms of cocaine. Muniz scheduled the transaction for the following day, but voiced some uncertainty about whether he could fill the full order in one fell swoop, telling Omer: "I don't know if I can get ... as many sets for tomorrow." Asked how many sets (a code word for kilograms of cocaine) he definitely could provide, and when, Muniz replied: "Two or three maybe and the rest for the next day." At a subsequent point in the conversation, Omer again inquired about how many kilograms would be delivered the following day, and Muniz responded, "Two ... or three maybe, I don't know, I'm not sure." The two men agreed to meet the next afternoon, February 5, at an inn in Sturbridge, Massachusetts. Muniz reaffirmed that although five sets might not be immediately available, he would fill the entire order with reasonable celerity: "It could be two or three [kilograms] tomorrow and do the rest the next day."

On February 5, the men spoke again by telephone. In this conversation, Muniz emphasized that the customer needed to bring enough money to pay for as many as three

sets. At approximately 8:00 p.m. on the same date, Muniz and a confederate, Juan Carlos Villar, met Omer Belle at the appointed place. The trio proceeded to a room where the customer (in reality an undercover agent) waited. Once inside, Muniz handed the agent two kilograms of cocaine. When the agent said, "I thought it was three," Muniz replied, "No, two today, three tomorrow," and volunteered: "If you want three tomorrow, I can bring three tomorrow, no problem." Following a further discussion regarding prices and possible future transactions, Muniz again assured the agent that his sources had "promised three for tomorrow, no problem." At that point, law enforcement officers arrested both Muniz and Villar.[2]

## II. THE ROAD TO SENTENCING

On March 2, a federal grand jury charged Muniz with possessing cocaine, intending to distribute it, 21 U.S.C. § 841(a)(1), conspiracy to distribute, 21 U.S.C. § 846, and aiding and abetting, 18 U.S.C. § 2. Shortly thereafter, the government filed a notice memorializing its position that, for the purpose of determining Muniz's offense level under the federal sentencing guidelines, the prosecution would seek to hold him accountable for five to fifteen kilograms of cocaine, thus triggering a ten-year minimum mandatory sentence on the conspiracy count under 21 U.S.C. § 841(b)(1)(A)(ii). The notice also admonished that a five-year minimum mandatory sentence applied to the other count under 21 U.S.C. § 841(b)(1)(B)(ii).

On March 29, Muniz pled guilty to both counts of the indictment. In the plea contract, the parties agreed to disagree anent length of sentence; the government continued to advocate a ten-year sentence, while Muniz asserted that only a five-year minimum applied because his case involved well under five kilograms of cocaine. At the change-of-plea hearing, both parties stuck to their guns. The government reiterated that Muniz should be held responsible for at least five kilograms of cocaine because he agreed to deliver that amount to the undercover agent. Muniz, however, dismissed any state-

---

2. The grand jury indicted Villar along with Mun-

iz. Villar, however, is not a party to this appeal.

ments he had made about undelivered quantities as mere "puffing or exaggerating," and urged that he should only be held accountable for the amount of contraband actually delivered.

The Probation Department sided with the government. In espousing this view, the PSI Report alluded not only to the, events occurring on February 4 and 5 'but also to the post-arrest statements · of' Muniz, Camille Belle, and Villar intimating that they had dealt with each other on a regular basis in the past. Muniz filed a number of objections to the PSI Report. He continued to debunk statements he had made about his ability to procure the full five kilograms of cocaine as unfounded rodomontade, and argued that he had no means of obtaining so huge a quantity. In respect to past dealings, Muniz admitted that he had delivered 125 grams of cocaine to Camille Belle in late 1993 but denied having sold drugs on any other occasion. Not to be outdone, the government filed an affidavit signed by a DEA agent, Steven Story, corroborating many of the facts recited in the PSI Report.

### III. THE IMPOSITION OF SENTENCE

In the typical narcotics case, the sentencing guidelines link drug quantity to sentence length. *See, e.g., United States v. Sepulveda,* 15 F.3d 1161, 1196 (1st Cir.1993) ("In drug-trafficking cases under the sentencing guidelines, sentences are largely quantity-driven."), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). But ascertaining drug quantity is not always a simple matter of weighing and sorting. When the district court sentenced Muniz on June 15, 1994,[3] the parties waged a pitched battle concerning the three kilograms of cocaine that Muniz had agreed to supply but had not delivered. A five-year difference in the minimum mandatory sentence depended on whether these three kilograms did or did not

figure in the ·drug quantity attributable to Muniz.[4]

The ·parties agree for purposes of this appeal that the key to unlocking the drug quantity puzzle here can be found in an application note that states in pertinent part:

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S.S.G. § 2D1.1, comment., n. 12 (Nov. 1993). We have interpreted application note 12 as directing that the amount of drugs under negotiation must be considered in determining the applicability of a minimum · mandatory penalty unless the sentencing court supportably finds' *both* that the defendant did not intend to produce the additional quantity of narcotics, *and* that he lacked the capacity to do so. *See United States v. Pion,* 25 F.3d 18, 25 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). ·Phrased another way, if the court finds by a preponderance of the evidence in regard to an aborted narcotics transaction that the defendant had *either* the intent or the capacity to deliver the full amount of the drugs under' negotiation, then that amount must be included in the drug quantity calculation.

Here, Muniz contended that the evidence failed to show either intent or capacity. In an effort to glean the material facts, the district court asked Agent Story to testify, questioned him *sua sponte,* and allowed defense counsel to cross-examine him. Near

---

3. The November 1993 edition of the federal sentencing guidelines applies to this case. *See United States v. Aymelek,* 926 F.2d 64, 66 n. 1 (1st Cir.1991) (explaining that, absent *ex post facto* concerns, a sentencing court must consult the guidelines in effect at the time of sentencing). Thus, all references herein are to that version.

4. Although the government urged the district court to consider other transactions, *e.g.,* Muniz's prior sales of cocaine to the Belles, as relevant conduct includable in the drug quantity calculation, the court rejected this, exhortation. The government has not appealed the court's refusal to hold Muniz responsible for other relevant conduct.

the end of the disposition hearing, the court and the Assistant United States Attorney (AUSA) discussed the holding in *Pion* and its relevance to Muniz's case:

> [AUSA]: But even if the Court were to find that [Muniz] wasn't reasonably capable of producing [the three additional kilograms], in this case because he intended to produce it, under *Pion,* the minimum mandatory still applies.
>
> THE COURT: So you only need one of those factors?
>
> [AUSA]: That's correct, your Honor.
>
> THE COURT: Well, . . . I'm not enthusiastic about this type of a sentence, because I grew up in an era where you sentence under the specific terms of the indictment. But I'm constrained to find, unless [defense counsel] can persuade me to the contrary, that there is sufficient evidence that he intended to produce the three additional kilograms and that he was, in fact, capable of so doing.

When defense counsel suggested that it "seem[ed] logically contradictory to intend to do something and not be capable of doing it," the district judge responded: "No, I said both.... I'm constrained to find that he intended to do it and was capable of so doing." The judge then explained his use of the phrase "constrained to find," stating:

> ... I don't like to do it because I'd rather sentence by the terms of an indictment, namely, two kilograms. But the law [provides] that if an intention is made to produce further kilograms and that the defendant is capable of so doing, that enters into the calculus as to the weight of the cocaine which is the basis for the offense. And I have to so find.

After a further exchange with defense counsel, the judge indicated that he had ruled, and switched the subject: "The finding having been made, what is the recommendation of the government?" Not surprisingly, the AUSA recommended a ten-year sentence. Muniz's lawyer then made an impassioned plea for reconsideration of the court's findings, attacking the credibility of Camille Belle (who had provided information to the DEA about Muniz's resources as a drug supplier) and stressing the perceived unfairness of a ten-year sentence in light of Muniz's previously unblemished record. Upon hearing the defendant's allocution—in which the defendant shed no additional light on the issues of intent and capability, but merely admitted his guilt and beseeched the court "not [to] be too tough on me"—the court passed sentence:

> After review of the entire evidence in this case, I think a fair sentence, in view of the statement that has been made by the defendant, I'm going to base my sentence on the hard evidence of the two kilograms of cocaine. Therefore, under the statute, I'm going to impose a term of five years' imprisonment, five years' supervised release, and $100 special assessment.
>
> This man doesn't appear to have any record whatsoever. He doesn't appear to have made significant amounts of money in this business of cocaine trafficking. I cannot believe that he's a major dealer, and it's unconscionable for me to impose a sentence of ten years on this individual. I think five years is a fair and just sentence, and that will be the sentence imposed.

The court subsequently issued a written judgment that extended well beyond its remarks at sentencing. The judgment stated in relevant part:

> The Court did not impose a mandatory sentence of 120 months, as it was not sufficiently satisfied, on the basis of the evidence introduced at the sentencing hearing and on the defendant's denial, that the defendant would have actually transferred three additional kilograms of cocaine on the next day, the factor necessary to the mandatory imposition of an additional 60–month term of imprisonment.

The government now appeals the imposition of a five-year sentence.

## IV. DISCUSSION

■ The prosecution argues that the sentence imposed is thrice flawed. It says (1) that the court, having found both that Muniz intended to deliver the full amount under negotiation and that he possessed the capability to do so, erred in not including the extra three kilograms of cocaine in the drug

quantity calculation as required by application note 12; (2) that, in view of the record evidence, any contrary finding—that Muniz lacked the requisite intent, or that he lacked the requisite capability, or both—would be clearly erroneous, and, therefore, without legal force; and (3) that the court, as evidenced by its written judgment, misinterpreted and misapplied the applicable legal standard. We approach these contentions mindful that a district court's findings of fact at sentencing are reviewed deferentially under the "clearly erroneous" standard. However, the court's interpretation of the guidelines and its application of rules of law to the discerned facts are reviewed *de novo*. *See United States v. Brewster*, 1 F.3d 51, 54 (1st Cir.1993); *United States v. St. Cyr*, 977 F.2d 698, 701 (1st Cir.1992).

We address the government's claim as an undifferentiated whole, beginning with those aspects of it that require interpretation of the comments uttered from the bench at the time of sentencing. The government understands the court to have made definite findings of fact signifying that Muniz intended to deliver an additional three kilograms of cocaine on February 6, and that he had the capability to do so. Since the court viewed the facts in that way, the government posits, it obviously misread application note 12, or otherwise misapplied the law, in not attributing the weight under negotiation to Muniz for sentencing purposes. And, moreover, the government's thesis runs, any other findings would be so clearly erroneous that a reviewing court would be duty bound to set them aside.

The defendant articulates a somewhat different understanding of what transpired. Though he concedes that the district court initially found against him on both the intent and capacity prongs of the application note 12 paradigm, he asserts that the court reconsidered and, on reflection, found insufficient evidence of those elements. Because the *nisi prius* roll supports the reconsidered findings, Muniz asseverates, the court acted lawfully in sentencing him based only on the two kilograms of cocaine that he actually delivered, and nothing more.

On this scumbled record, we cannot fully endorse either party's view. While the district court was apparently persuaded the first time around that Muniz had both the intent and the capability to deliver the promised three kilograms of cocaine, the court's words have a cryptic quality and its findings—if we can call them findings at all—are sufficiently recondite that they give us pause. To add to the confusion, the court's abrupt about-face undermines our confidence in its earlier statements.

▉ Having refused to hunt with the hounds, we likewise refuse to hold with the hare. Although Muniz's claim that the court reconsidered its initial findings and reversed its field is not entirely without record support—Judge Harrington's statement that his decision would be based on "hard evidence" of two kilograms of cocaine, made on the heels of defense counsel's request for reconsideration and coupled with the imposition of a five-year (rather than a ten-year) sentence, allows an inference, strained as it may be, that the judge rethought the issues of intent and capacity and came out the other way—it withers under close scrutiny. The judge never explicitly disclaimed his earlier findings; he offered no reasoned justification for the sudden turnaround; and he made no supportive findings of subsidiary fact. Reading the record with an unjaundiced eye, the judge's 180–degree turn defies rational explanation. We conclude, therefore, that the court's findings are, on balance, so inexplicit that the sentence cannot plausibly rest on them. *Cf. United States v. Tavano*, 12 F.3d 301, 305 n. 5 (1st Cir.1993) (suggesting that, when there is significant uncertainty about the meaning of the sentencing judge's statements, the ends of justice are usually best served by starting afresh); *United States v. Aguilera–Zapata*, 901 F.2d 1209, 1216 (5th Cir.1990) (vacating sentence where record unclear as to whether sentencing court applied the correct legal standard).

▉ Nor can the sentence rest on the written memorandum prepared and filed by the district judge as a part of the judgment *after* he had sentenced the defendant. We cannot conveniently overlook the prior proceedings, but must evaluate the written docu-

ment—though it deviates in at least one salient respect from what the court said orally—as part and parcel of the entire sentencing record.[5] Viewed in that context, the written explanation is insufficient to overcome the deficiencies we have noted. More importantly, the written judgment is infected by a virulent error of law, and, thus, cannot be accorded substantial weight.

Explaining the court's error can best be accomplished by taking a close look at our opinion in *Pion.* There, the defendant had agreed to sell six kilograms of cocaine in two installments. *Pion,* 25 F.3d at 20. The DEA arrested him after he had tendered the first (three-kilogram) installment. *See id.* At sentencing, the judge imposed a ten-year minimum mandatory sentence after finding that, though Pion intended to deliver the second three-kilogram installment, he was not reasonably capable of doing so. *See id.* at 24–25. Pion assigned error to the inclusion of the undelivered quantity on the ground that, as the sentencing court had found, he lacked the capability to secure it. We rejected that argument, holding that application note 12 "requires the sentencing court to include 'the weight under negotiation in an uncompleted distribution' unless it finds that 'the defendant did not intend to produce *and* was not reasonably capable of producing the negotiated amount.'" *Id.* at 25 (citing application note 12). Consequently, Pion's claim failed "because neither conjunctive clause in note 12 can be ignored." *Id.*

■ In the document under consideration here, the district judge wrote that, based on the evidence, he "was not sufficiently satisfied ... that the defendant would have actually transferred three additional kilograms of cocaine on the next day...." He described this as "the factor necessary" to trigger the imposition of the higher (ten-year) minimum mandatory term of imprisonment. As a matter of law, the judge erred: as *Pion* teaches, whether a defendant *would actually have*

*transferred* additional drugs is not the relevant inquiry.

By focusing on the factual probability of delivery, the lower court turned the proper rule inside out. *Pion* stands for the proposition that a defendant's subjective intent to deliver drugs under negotiation is sufficient to trigger their inclusion, even if the defendant's intent is stymied by objective impossibility. *See id.* The judge's reasoning flies directly in the teeth of this proposition, and, in the bargain, contradicts the plain language of application note 12.

■ Although what we have said to this point explains the need to vacate Muniz's sentence, we feel obliged to comment on a larger issue. Judges are free, of course, to express their views about the wisdom of guideline sentencing, and many have chosen to do so. But when such value judgments occur in the context of a judicial proceeding, it is incumbent upon the judge to avoid the further (and quite different) impression that distaste has crossed the line into disregard. The circumstances of the case at bar underscore this danger.

When, for example, the AUSA reminded the district judge that our opinion in *Pion* was on all fours, the judge stated:

I understand what the First Circuit said. What I have problems with is that when somebody is charged in an indictment [with] a specific amount and then talk that they're going to produce something else but they don't because they're arrested, and then you come to court, ... and you ask for a sentence based on a fact that three additional kilograms [would be] delivered, it's a very uncomfortable position to be placed in. It seems to me that if the government wants to charge somebody for five kilograms, then why not grab him after they produce them, rather than arresting him after two and then asking for five additional years for something that he hasn't done.

---

5. Where, as in this case, the district court's oral expression of its sentencing rationale varies materially from its subsequent written expression of that rationale, appellate courts have tended to honor the former at the expense of the latter. *See, e.g., United States v. Dumorney,* 949 F.2d 997, 997–98 (8th Cir.1991). Because we find that neither the court's oral nor written findings adequately support the sentence, we need not address the incipient problems posed by the inconsistencies between them.

Moments later, the judge repeated these sentiments.[6] Moreover, the court said much the same thing in announcing its rulings rejecting the government's proffer of relevant conduct evidence. *See supra* note 4.

It is not these statements in the abstract that present the problem; rather, it is the context they provide for the district court's judicial actions. Courts do sometimes change positions; but to revise findings, without direct explanation or effort at support, after substantially criticizing the controlling legal rules, can create a damaging impression. In this case, that unhealthy circumstance also permitted attention to be drawn to other cases in which the court of appeals rebuked the district judge for failure to adhere to the guidelines. *See, e.g., United States v. Bennett*, 37 F.3d 687 (1st Cir.1994); *United States v. Norflett*, 922 F.2d 50 (1st Cir.1990); *United States v. Williams*, 891 F.2d 962 (1st Cir.1989).

██ It is vital to the rule of law that congressional commands, so long as they are constitutionally appropriate, be honored. Federal courts, in particular, are not at liberty to disregard lawful directives of Congress (or the Sentencing Commission for that matter) simply because those directives conflict with the judge's personal notions of fairness. In the last analysis, it is crucial to public confidence in the courts that judges be seen as enforcing the law and as obeying it themselves.

This principle applies with full force to the guidelines which, in substance, *are* commands to judges.[7] Constitutional defects aside, "when ... the legislative trumpet sounds clearly, courts are duty bound to honor the clarion call." *United States v. Jackson*, 30 F.3d 199, 204 (1st Cir.1994).

## V. THE REMEDY

We must yet decide how best to handle a situation riddled by error. Mindful, as we are, of both the high stakes and the abundant ambiguities, we decline the parties' invitations to speculate about what the court did or did not mean. We likewise decline to insert ourselves into the breach by attempting, on a cold record, to find the facts from scratch. In the end, the course of prudence beckons. We are left with no principled choice but to vacate the defendant's sentence and remand for a completely new sentencing hearing. This alternative is especially attractive here because of the strong possibility that the judge's antipathy for the sentencing regime either influenced or might reasonably be thought to have influenced the imposition of the particular sentence. For reasons that we think are apparent, we direct that resentencing be before a different judge.

*The defendant's conviction is affirmed, his sentence is vacated, and the cause is remanded for resentencing, with instructions.*

---

**6.** The court confided:

I don't like to sentence someone for five additional years on weight that was not transmitted or transferred or produced, the weight of the narcotic, something that was promised, especially if it's a double sentence. If it was asking for a year, maybe you could sallow it, but you're going from five to ten years, mandatory.

**7.** Of course, this principle applies with equal if not greater force in cases to which minimum mandatory sentences attach. In those situations, Congress, by definition, has made explicit policy choices.