United States Court of Appeals
 For the First Circuit
 

No. 94-1546

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 RODERICK A. CAMPBELL,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ernest C. Torres, U.S. District Judge] 

 

 Before

 Boudin, Circuit Judge, 
 Coffin, Senior Circuit Judge, 
 and Stahl, Circuit Judge. 

 

 Albert B. West, by Appointment of the Court, for appellant.  
 Roderick A. Campbell on brief pro se. 
 Margaret E. Curran, Assistant U.S. Attorney, with whom Sheldon 
Whitehouse, United States Attorney, and Kenneth P. Madden, Assistant 
U.S. Attorney, were on brief for appellee.

 

 July 31, 1995
 

 COFFIN, Senior Circuit Judge. Appellant Roderick Campbell 

was convicted on six counts related to the manufacture and

distribution of phenylacetone (P2P) and sentenced to a term of

imprisonment of 288 months. He raises numerous issues concerning

his trial and sentencing, none of which we find meritorious.

 I. Factual and Procedural Background 

 We begin with a brief review of the facts, as the jury could

have found them, providing more details later in the opinion as

necessary to provide context for our discussion.

 In early 1993, a special agent for the Drug Enforcement

Agency working in an undercover role initiated a relationship

with defendant Campbell. The agent, Kelly, claimed to be working

for a New York organization that was looking for a steady source

of P2P to be used in the manufacture of methamphetamine.

Campbell agreed to set up a laboratory.

 On February 10, 1993, Kelly met Campbell at a laboratory

that had been set up in a home in Cranston, Rhode Island.

Campbell delivered a small amount of a substance that was

supposed to be P2P, but testing showed that it was not. Campbell

indicated to Kelly that the negative results were due to his use

of an alternative manufacturing method designed to avoid the

distinctive odor associated with the traditional method of

manufacturing P2P. A second sample delivered about two weeks

later, manufactured by the traditional method, did contain P2P.

 In March, Campbell moved the lab to a new location in

Providence, and Kelly was introduced to Campbell's associate,

 -2-

Harold Farrell, who said that he would be responsible for

delivering the P2P from that point on. Farrell indicated to

Kelly that 100 gallons of P2P would be manufactured. During

March and April, six separate deliveries of mixtures containing

P2P were made to Kelly by either Farrell alone or by both Farrell

and Campbell. An additional seven deliveries were determined not

to contain any P2P.

 Campbell, Farrell and two laboratory assistants were

arrested on May 26, 1993. A DEA chemist testified that when he

entered the laboratory that day he observed active chemical

reactions consistent with the manufacture of P2P, and also found

in the lab all of the chemicals necessary to produce P2P.

 A federal grand jury originally charged Campbell and Farrell

in an eighteen-count indictment. Seven distribution counts were

dismissed after laboratory analysis showed that the mixtures

involved in those deliveries tested negative for the presence of

controlled substances. Farrell pleaded guilty to ten counts, and

was sentenced to ten concurrent terms of 48 months' imprisonment.

 A redacted indictment was filed at the outset of Campbell's

trial, charging him with seven counts: conspiracy to manufacture,

distribute and possess with intent to distribute P2P, in

violation of 21 U.S.C. 841(a)(1) and 846 (count one);

knowingly and intentionally manufacturing P2P, in violation of 

841(a)(1), (b)(1)(C), and 18 U.S.C. 2 (count two); maintaining

a place for the purpose of manufacturing P2P, in violation of 

856 (count three); knowingly and intentionally distributing P2P

 -3-

on three dates in February, March and April 1993, in violation of

 841(a)(1), (b)(1)(C), and 18 U.S.C. 2 (counts four through

six); and conspiracy to manufacture methaqualone, in violation of

 846 (count seven).

 Campbell's defense was that he never intended to manufacture

P2P, but instead sought to mislead his customer, Kelly, into

purchasing lawful chemical substances. He testified that he

hoped to finance legitimate business interests with money made

from the sale of these substances. He claimed that the presence

of P2P in some of the deliveries was inadvertent.

 Following eight days of trial, the jury found Campbell

guilty on counts one through six, the P2P counts, and not guilty

on count seven, the methaqualone count. He was sentenced to

concurrent 288-month terms of imprisonment on all but count

three, and to a concurrent 240-month term (the statutory maximum)

on that count. This appeal followed.

 II. Challenges to Conviction 

 We address Campbell's several claims in turn.

 (1) "Detectable" Quantity of P2P 

 Campbell makes several arguments that all reduce essentially

to the claim that his conviction was unlawful because the amount

of P2P confiscated was too small. As a starting point, we note

that the statutes contain no language setting a minimum quantity

as a prerequisite for prosecution. See 21 U.S.C. 841 (a)(1) 

("[I]t shall be unlawful for any person knowingly or

intentionally . . . to manufacture, distribute, or dispense, or

 -4-

possess with intent to manufacture, distribute, or dispense, a

controlled substance . . . ."). See also id. at 846, 856.1 

Ample caselaw further establishes that no specific quantity needs

to be proven for conviction. See United States v. Restrepo- 

Contreras, 942 F.2d 96, 99 n.1 (1st Cir. 1991); see also United 

States v. Bounds, 985 F.2d 188, 193-94 (5th Cir. 1993); United 

States v. Kwong-Wah, 966 F.2d 682, 685 (D.C. Cir. 1992) (citing 

other cases).

 The amount of the controlled substance underlying a criminal

indictment typically becomes relevant only at the penalty stage.

See 21 U.S.C. 841(b); Kwong-Wah, 966 F.2d at 685. The 

Sentencing Guidelines set penalties based on weight, and state

that the weights set forth in the Drug Quantity Table refer to

"the entire weight of any mixture or substance containing a

detectable amount of the controlled substance." U.S.S.G. 2D1.1

n.*. Thus, any "detectable amount" is sufficient to trigger a

penalty.

 Taking this scheme at face value, Campbell's conviction is

rock solid since no one disputes that a "detectable" amount of

P2P was obtained. Campbell, however, claims that the

Constitution requires a different analysis when the controlled

substance at issue is a precursor chemical like P2P, whose

manufacture and possession is proscribed solely because of its

relationship to another controlled substance (in the case of P2P,

  

 1 Campbell does not contest that P2P is a controlled
substance.

 -5-

either amphetamine or methamphetamine). See 21 U.S.C. 811(e) 

(authorizing Attorney General to place an immediate precursor in

the same schedule in which the controlled substance of which it

is an immediate precursor is placed or in any higher schedule).

Campbell maintains that a precursor must be found in sufficient

quantity to be useable in making the controlled substance to

which it owes its illegality. Prosecuting lesser amounts, he

asserts, is outside the scope of Congress' intent in regulating

controlled substances and an impermissibly vague application of

federal drug laws.

 Whatever the merits of such arguments in a case in which a

totally unuseable amount of a controlled precursor chemical has

been seized, see United States v. Ruff, 984 F.2d 635, 639 (5th 

Cir. 1993),2 they are unavailing here. The defendant's own

expert testified that the samples delivered in this case

contained enough P2P to produce at least a small amount of

methamphetamine.3 Thus, the charged conduct fell directly

within the statutory goal of controlling chemicals that may be

used in the manufacture of a controlled substance. See 21 U.S.C. 
  

 2 The Court in Ruff reversed a defendant's conviction for 
possession of P2P with intent to manufacture methamphetamine
because the only P2P possessed by the defendant -- trace amounts
that appeared to be the residue from a manufacturing process --
was not enough for manufacturing purposes. 984 F.2d at 639. 

 3 Dr. Suggs stated that the substances seized could be used
to produce from "one or two" methamphetamine pills to "many
dozens of pills," depending upon the percentage of P2P in the
mixtures and the method of production. He testified that,
according to his appraisal of the government's data, there was
between eight percent and less than one percent P2P contained in
the samples. 

 -6-

 802(23) (defining "immediate precursor"). We see no basis upon

which to exclude small amounts of useable precursors from the

statutory prohibition.

 Consequently, we need not explore the boundaries of the

Congressional grant of authority to criminalize the manufacture

of precursor chemicals. The fact that Campbell did produce a

useable amount of P2P also is fatal to his vagueness argument,

which rests upon the assertion that he could not have known that

unuseable amounts of P2P would subject him to prosecution.4

 (2) Reasonable Doubt Instruction 

 As part of its reasonable doubt instruction, the district

court told the jury that "a reasonable doubt is sometimes

described as a fair doubt based upon reason and common sense."

Campbell contends that this phrase made the court's reasonable

doubt instruction constitutionally defective, citing United 

States v. Campbell, 874 F.2d 838 (1st Cir. 1989). We disagree. 
  

 4 Indeed, the vagueness argument is entirely inapplicable
here. "[T]he void-for-vagueness doctrine requires that a penal
statute define the criminal offense with sufficient definiteness
that ordinary people can understand what conduct is prohibited
and in a manner that does not encourage arbitrary and
discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 
357 (1983) (quoted in Posters `N' Things, Ltd. v. United States, 
114 S. Ct. 1747, 1754 (1994)). The statute's absolute
prohibition against the manufacture, use and possession of
controlled substances provides an explicit warning against
dealing with any quantity. 
 Nor does the Guidelines' reference to "detectable"
quantities render the scheme unduly vague. The message is clear
that those who dabble in controlled substances will be subject to
prosecution if such substances are found. The fact that
increasingly sophisticated technology permits increasingly
smaller amounts to be detectable presents no constitutional
vagueness problem; it simply means that the opportunities for
violating the law without being caught are decreasing.

 -7-

In Campbell, we rejected a defendant's attack upon reasonable 

doubt instructions given at his trial, but also said that courts

should avoid equating reasonable doubt with fair doubt. Id. at 

842-43. Here, the court spoke of a fair doubt "based upon reason

and common sense." Since a reasonable doubt may be properly

described as a doubt based on reason, Victor v. Nebraska, 114 S. 

Ct. 1239, 1243 (1994), the concept of reasonable doubt was

present in the very formulation under attack. We do not believe

the jury would have understood use of the additional adjective

"fair" to have altered the correct meaning.

 Moreover, the court used the term "fair doubt" but once; it

used the term "reasonable doubt" no fewer than fifteen times.

For example, the court instructed the jury that the defendant "is

presumed innocent unless and until the Government proves him

guilty beyond a reasonable doubt" and that "in order to convict

the Defendant of any of these charges, the Government has to

prove all of the elements applicable to that charge beyond a

reasonable doubt." Taking the instructions as a whole, we are

convinced that the jury was properly advised of the very high

degree of confidence in Campbell's guilt needed in order to

convict.5 We see no reasonable likelihood that use of the term

  

 5 Indeed, our determination that Campbell's rights were
unimpaired by this instruction is reinforced by his counsel's
treatment of this issue at trial. Counsel initially objected to
use of the term "fair doubt," but the next day, when the court
asked for proposed clarifying language to read to the jury, he
did not offer any. While we need not treat this as formal
waiver, it confirms our view that use of the term was
insignificant here.

 -8-

here led the jury to apply a constitutionally deficient standard.

See id. at 1243. 

 (3) Cross-Examination of Expert Witness 

 Campbell next contends that the court erred in allowing only

his attorney, rather than him personally, to cross-examine a

government expert witness. A defendant has a right to be

represented by counsel, Gideon v. Wainwright, 372 U.S. 335, 344- 

45 (1963), or to proceed pro se, Faretta v. California, 422 U.S. 

806, 819-20 (1975), but does not have the right to "hybrid

representation" -- choosing those portions of the trial he wishes

to conduct and leaving the rest to counsel. McKaskle v. Wiggins, 

465 U.S. 168, 183 (1984). This does not mean that hybrid

representation is forbidden; rather, "it is to be employed

sparingly and, as a rule, is available only in the district

court's discretion." United States v. Nivica, 887 F.2d 1110, 

1121 (1st Cir. 1989). Stressing the highly technical nature of

the expert's testimony, Campbell argues that he, far more than

his lawyer, possessed the scientific expertise necessary for

effective cross-examination.

 We see no abuse of discretion in the trial judge's decision

to the contrary. The court found that, while defendant was an

expert in chemistry, defense counsel more effectively could

elicit the technical testimony in a fashion that would be

intelligible to the jury. Moreover, the court took pains to

accommodate Campbell's request. Defense counsel cross-examined

the expert thoroughly, frequently conferring with Campbell as he

 -9-

went. At the close of redirect testimony, the court specifically

asked the defense if it needed further time to confer, ostensibly

to determine whether to conduct recross-examination, and both

defense counsel and Campbell personally informed the court that

they were "all set." In sum, the district court balanced

Campbell's interest in bringing his knowledge of chemistry to

bear on the cross-examination of an important government witness

with its responsibility for the orderly administration of the

trial. It exercised its discretion quite appropriately.

 III. Challenges to Sentencing 

 Campbell claims that the district court over-sentenced him

in a variety of ways.6 After reviewing each of these claims

with care, we have concluded, for the reasons that follow, that

all are either legally or factually flawed.7

 (1) Calculation of Offense Level 

 As noted earlier, see Section II (1) supra, sentences for 

controlled substance convictions are linked to the quantity of
  

 6 The November 1993 edition of the federal sentencing
guidelines applies to this case. See United States v. Muniz, 49 
F.3d 36, 39 n.3 (1st Cir. 1995). Unless otherwise noted, all
references are to that version.

 7 In an easily resolved claim, Campbell contests the
district court's imposition of a two-level enhancement for abuse
of his special skill as a chemist. This enhancement is indicated
when a defendant "used a special skill . . . in a manner that
significantly facilitated the commission or concealment of the
offense." U.S.S.G. 3B1.3. Those possessing the requisite
special skills include "pilots, lawyers, doctors, accountants,
chemists, and demolition experts." Id. at comment. (n.2) 
(emphasis added). Thus, there is no abuse of discretion in the
court's conclusion that Campbell's near Ph.D. training as a
chemist facilitated his commission of the crime of manufacturing
the chemical P2P.

 -10-

drugs for which the defendant is found responsible. See United 

States v. Muniz, 49 F.3d 36, 39 (1st Cir. 1995). Campbell argues 

that the district court made two crucial errors in using a total

of 5,628.1 milliliters of P2P to calculate his base offense

level: (1) it wrongly included the total weight of the mixtures

containing P2P, rather than looking only to the actual P2P in

those mixtures, and (2) it wrongly included the weight of the

mixtures that tested negative for P2P. We consider each of these

assertions in turn.

 Total weight. The defendant's argument that only the actual 

amount of P2P should be considered is based on a 1993 amendment

to the commentary that follows the applicable guideline, U.S.S.G.

 2D1.1. The guideline states that, unless otherwise specified,

"the weight of a controlled substance set forth in the table

refers to the entire weight of any mixture or substance

containing a detectable amount of the controlled substance." 2

D1.1(c) (Drug Quantity) n.*. The commentary provides, in

relevant part, that:

 [m]ixture or substance does not include materials that
 must be separated from the controlled substance before
 the controlled substance can be used. Examples of such
 materials include the fiberglass in a
 cocaine/fiberglass bonded suitcase, beeswax in a
 cocaine/beeswax statue, and waste water from an illicit
 laboratory used to manufacture a controlled substance.

 2D1.1(c), comment. (n.1). In promulgating the amendment, the

Sentencing Commission sought to resolve a conflict in the

circuits "regarding the meaning of the term `mixture or

substance,' as used in 2D1.1 by expressly providing that this

 -11-

term does not include portions of a drug mixture that have to be

separated from the controlled substance before the controlled

substance can be used." U.S.S.G. App. C, amend. 484. See United 

States v. Killion, 7 F.3d 927, 932-33 (10th Cir. 1993) 

(describing conflict and citing cases).8

 The commentary and explanation make it clear that the

district court properly considered the total weight of the P2P

mixtures. The commentary excludes only materials that are

unusable or unmarketable, such as those used to transport the

controlled substance, see, e.g., United States v. Mahecha-Onofre, 

936 F.2d 623, 625-26 (1st Cir. 1991); United States v. Palacios- 

Molina, 7 F.3d 49, 51-54 (5th Cir. 1993), or waste products of 

the drug manufacturing process that are discarded before the

controlled substance is put into the distribution chain, see, 

e.g., United States v. Johnson, 999 F.2d 1192, 1194 (7th Cir. 

1993). The mixtures in this case did not contain surplus

materials that needed to be separated from the P2P before it was

useable. Both the defendant's and government's experts testified

that methamphetamines may be made from such mixtures, and,

indeed, the mixtures themselves were the products sold by

Campbell to Kelly. See Palacios-Molina, 7 F.3d at 54 ("[I]t is 

  

 8 This circuit had held that the weight of unusable,
unmarketable materials may be included for sentencing purposes.
See, e.g., United States v. Mahecha-Onofre, 936 F.2d 623, 625-26 
(1st Cir. 1991) (entire weight of suitcases composed of cocaine
bonded chemically with acrylic suitcase material minus all metal
parts was includable for sentencing purposes); United States v. 
Restrepo-Contreras, 942 F.2d 96, 99 (1st Cir. 1991) (proper to 
include weight of statues made of cocaine and beeswax). 

 -12-

the amount of th[e] commodity trafficked that counts."). As

such, the non-P2P materials in these mixtures were akin to

cutting agents or impurities, not waste products.9 Thus, in

these circumstances, the guideline provides for counting the

total weight of the liquids containing P2P.10

 Negative mixtures. Campbell and Farrell delivered a total 

of 4007.1 milliliters of substances that turned out to contain no

detectable amounts of P2P. The district court included this

amount in calculating Campbell's offense level based on a finding

that Campbell "conspired to manufacture and to possess with

intent to distribute all P2P whether it turned out to be P2P or

  

 9 Defendant cites United States v. Mimms, 43 F.3d 217 (5th 
Cir. 1995) (per curiam), in support of his contention that only 
the actual P2P should be counted. The court in Mimms remanded 
for further fact findings after concluding that the district
court had misinterpreted expert testimony concerning the amount
of P2P contained in three containers holding about 32 pounds of a
slurry-liquid substance. The district court erroneously thought
the expert had stated that 20 percent of the entire exhibit was
P2P when, in fact, the expert had indicated that 20 percent of
the liquid poured from the three containers (at most, 91.55
grams) was P2P. The Fifth Circuit's discussion, somewhat sketchy
in this per curiam opinion, suggests that the district court 
should have used the weight of only the 20 percent of the liquid
that was P2P.
 Nothing in the opinion, however, indicates whether the
liquid mixture containing the P2P was useable or marketable. It
was described as resulting from "a reaction mixture." Id. at 
220. We therefore view Mimms as distinguishable from this case, 
where testimony showed the entire substance to be both useable
and marketable. See also United States v. Towe, 26 F.3d 614, 
616-17 (5th Cir. 1994) (per curiam) (improper to sentence 
defendant based on total weight of mixture containing P2P if
mixture contained waste products).

 10 Because the offense level calculation properly took into
account the total quantity of the mixtures, we reject defendant's
claim that the district court erred in denying his motion for
funds to analyze the concentrations of P2P in the mixtures.

 -13-

not or whether it turned out to be a mixture or substance

containing only relatively small amounts of P2P."

 This approach to drug quantity is proper. The span of the

conspiracy charged in the indictment encompassed all fourteen

deliveries, including the seven that ultimately tested negative.

The guidelines state, in relevant part:

 If the offense involved both a substantive drug
 offense and an attempt or conspiracy (e.g., sale of
 five grams of heroin and an attempt to sell an
 additional ten grams of heroin), the total quantity
 involved shall be aggregated to determine the scale of
 the offense.

U.S.S.G. 2D1.1, comment. (n.12). The same evidence that

permitted the jury to find, beyond a reasonable doubt, that

Campbell intended to produce P2P supported the court's finding

that each delivery, regardless of its actual P2P content, was an

intended part of the charged scheme. See supra at 2-3.11 

Under the guideline provision quoted above, such a finding

requires inclusion of the negative substances in the drug

quantity calculation. See United States v. Youngpeter, 986 F.2d 

349, 354 (10th Cir. 1993) (where effort to produce six pounds of

methamphetamine produced only one because of "inept cooking

ability," full amount intended is counted).12 Cf. Muniz, 49 
  

 11 The district court's sentencing findings, of course, may
be based on the lower preponderance-of-the-evidence standard.
United States v. Legarda, 17 F.3d 496, 499 (1st Cir. 1994). We 
review its findings of fact at sentencing under the deferential
clearly erroneous standard. Muniz, 49 F.3d at 41. 

 12 Youngpeter involved U.S.S.G. 2D1.4, which provided that 
if the defendant is convicted of a conspiracy or an attempt to
commit any controlled substance offense, the offense level shall
be the same "as if the object of the conspiracy or attempt had

 -14-

F.3d at 39 (if defendant had either the intent or capacity to

deliver the full amount of drugs under negotiation in an aborted

narcotics transaction, then that amount must be included); United 

States v. White, 888 F.2d 490, 499 (7th Cir. 1989) ("The 

Guidelines treat success and failure, conviction and no

conviction,alikeindrugcases,solongastheamountsareascertainable.")

 We therefore detect no error in the court's basing

Campbell's sentence on the full amount of the liquids delivered

during the course of the conspiracy.

 (2) Enhancement for Obstruction of Justice 

 Campbell next contests the imposition of a two-level

enhancement for obstruction of justice, which was based upon the

court's finding that he had committed perjury. The guidelines

specifically list perjury as a trigger of the obstruction

enhancement. U.S.S.G. 3C1.1 comment., (n.3(b)). And the court

clearly applied the correct legal test for perjury: whether the

defendant intentionally gave false testimony concerning a

material matter. See United States v. Dunnigan, 113 S. Ct. 1111, 

1116 (1993); United States v. Matiz, 14 F.3d 79, 84 (1st Cir. 

1994). Thus, the only basis for disturbing the enhancement is if

the fact finding of perjury were clearly erroneous. United 

States v. Tracey, 36 F.3d 199, 202 (1st Cir. 1994). 

 The court based its finding on Campbell's testimony at trial

and a three-day sentencing hearing, during which he consistently

  

been completed." That section later was subsumed within 2D1.1.
See U.S.S.G. App. C, amend. 447.  

 -15-

maintained that the P2P in the mixtures he delivered had been

produced by accident; his true intent, he maintained, was not to

produce any P2P, but to deceive his purchasers into believing

they were receiving P2P. The court made express fact findings

supporting its perjury determination at the conclusion of the

sentencing hearing, noting that a number of factors belied

Campbell's story. First, it found incredible Campbell's

contention that he was attempting to deceive individuals whom he

believed to be New York-based narcotics traffickers, because he

had no means of protecting himself when they found out that they

had been swindled. Second, the court found it implausible that

he would have told his co-conspirator that the substances being

delivered were 85% P2P, as he admitted he had, if he believed

they contained no P2P at all. Third, the court found that the

complexity and sophistication of the laboratory Campbell

established supported the conclusion that he intended to produce

P2P, not, as he claimed, to deceive one of the purchasers who

obviously had no experience in chemistry or P2P production and

could have been deceived by a far less elaborate setup. The

court went on to find that, at several points, Campbell gave

testimony at his sentencing hearing that was facially implausible

and contradictory.

 In short, after reviewing the trial and sentencing

transcripts, we find the court's conclusion that Campbell gave

deliberately false testimony to be amply supported in the record.

Since the false testimony was relevant to whether he possessed

 -16-

the required mental state for the crime and to the severity of

sentence, it was obviously material. See Matiz, 14 F.3d at 84 

(court of appeals can make materiality determination absent

express district court finding). Thus, we affirm the obstruction

enhancement.

 (3) Upward Departure in Criminal History 

 Campbell also takes issue with the upward adjustment of his

Criminal History Category (CHC) based on the court's

determination that his original CHC did not account for all of

his prior criminal activity, and that Campbell was likely to be a

recidivist. First, in a single sentence without any citation to

legal authority, he contends that the court gave insufficient

notice of its intent to depart, and of its reasons for departing.

By failing to develop this point adequately, Campbell has

forfeited it. United States v. Fahm, 13 F.3d 447, 450 n.2 (1st 

Cir. 1994).13 His broader claim that the court erred in its

departure, while properly before us, gives him no greater succor.

 In general, we use a three-part inquiry to assess a court's

decision to depart: "first, are the circumstances of the case

sufficiently unusual to justify departure; second, do the relied-

upon factual circumstances actually exist; and third, is the

departure reasonable." United States v. Parkinson, 44 F.3d 6, 9 

(1st Cir. 1994) (citations omitted). There is no question that

  

 13 We note that the argument had little promise in any
event, for the presentence report and the government's sentencing
memorandum notified Campbell of the grounds ultimately relied
upon by the court for its upward departure.

 -17-

the circumstances here are of a type that may warrant departure.

See U.S.S.G. 4A1.3, p.s. (expressly authorizing departure when 

"reliable information indicates that the [CHC] does not

adequately reflect the seriousness of the defendant's past

criminal conduct or the likelihood that the defendant will commit

other crimes"); accord Fahm, 13 F.3d at 450. 

 We review the court's factual findings for clear error, and

we give considerable deference to its "judgment call" as to

whether those facts warrant the departure. Id. at 450-51. Here, 

the court made several independent findings, any one of which was

sufficient to trigger the adjustment. The court found that

Campbell had engaged in assorted criminal conduct that had not

been included in his CHC, including manufacturing and selling

grignard reagents after learning that they were being used for

illegal purposes and making deliveries of PCP (commonly known as

angel dust) in addition to a delivery in 1983 for which he was

convicted. The basis for both of these findings were admissions

by Campbell himself, hardly the stuff of clear error. Moreover,

based on the fact that Campbell committed the instant crimes

shortly after being released from a significant prison term for

similar conduct, and on the court's finding that he had displayed

a complete lack of contrition or remorse during the proceedings,

the court concluded that he was likely to return to similar

criminal activity upon his release. The court's fact findings

were not clearly erroneous, and we see no basis here for

disturbing the court's judgment that an enhancement was

 -18-

indicated. Finally, in light of the multiple grounds upon which

the enhancement was based, we can hardly say that the amount of

the enhancement, from CHC III to CHC IV, was unreasonable.

 (4) The 416 vs. 75 Multiplier 

 Campbell claims that the district court erred by using the

wrong multiplier to convert the weight of the P2P into its

equivalent marijuana weight. Deriving a marijuana weight was

necessary because the Drug Quantity Table in the sentencing

guidelines lists offense levels for only the most common types of

controlled substances. To determine the appropriate sentence for

crimes involving less common substances, such as P2P, a judge

must calculate their marijuana equivalent.

 Drug Equivalency Tables are provided for this purpose.

According to the relevant table, one gram of P2P is equivalent to

416 grams of marijuana "when possessed for the purpose of

manufacturing methamphetamine." "[I]n any other case," one gram

of P2P is equivalent to 75 grams of marijuana.

 The district court selected the 416 multiplier because of

its fully supportable finding that Campbell knew that the P2P he

was making was intended ultimately to be used to manufacture

methamphetamine. Campbell, however, argues that the higher

multiplier applies only when P2P possessors also are the

methamphetamine manufacturers, since only then would a defendant

in fact possess the P2P "for the purpose of manufacturing

methamphetamine."

 -19-

 Although such an interpretation seems technically possible

given the language of the provision, closer analysis reveals its

flaw. The government suggests that the provision reflects a

judgment by the Sentencing Commission to attach a higher penalty

to the most serious possession of P2P -- for the purpose of

manufacturing methamphetamine -- as distinguished from possession

of P2P for use in making amphetamine or possession without

knowledge of its intended use. According to the government, an

individual making P2P destined for use in manufacturing

methamphetamine is thus subject to the 416 multiplier, whether or

not that person actually intended to manufacture the

methamphetamine.

 While there is no caselaw on point, the history of the P2P

listings in the equivalency table supports this view of the

provision's reach. Before November 1989, those listings

contained different conversion amounts for P2P explicitly

depending upon whether the P2P was an amphetamine precursor or a

methamphetamine precursor. See U.S.S.G. App. C, amend. 125.14 

An amendment to the guidelines at that time changed the language

to its present form, without any accompanying explanation that

the revision was meant to change the basic reason for the two-

tiered approach to P2P sentencing. See id. We therefore think 
  

 14 The earlier version of the table stated that "1 gm of
Phenylacetone/P2P (amphetamine precursor)" equalled 0.375 grams
of cocaine or 0.075 grams of heroin and that "1 gm of
Phenylace[t]one/P2P (methamphetamine precursor)" equalled 0.833
grams of cocaine or 0.167 grams of heroin. U.S.S.G. App. C,
amend. 125. A later amendment changed the cocaine and heroin
references to amounts of marijuana. Id. at amend. 396. 

 -20-

it evident that no substantive change was intended, and that the

two multipliers continue to reflect a judgment that possessing

P2P linked to the manufacture of methamphetamine is a more

serious crime than possessing it in other circumstances.15 

 Although the new language left room for Campbell's argument

here,16 the legislative history satisfies us that the

Sentencing Commission intended that a defendant who possesses P2P

for the ultimate purpose of manufacturing methamphetamine is

subject to the higher multiplier, regardless of who actually

makes the methamphetamine. The district court's finding that

Campbell possessed the P2P for that purpose is unassailable.

 IV. Conclusion 

 Having carefully considered each of the defendant's claims,

we are unable to detect any reversible error in the district

court's conduct of the trial or its decisions on sentencing. We

wish to note, however, our sense that the sum of the parts here

is a whole that is contrary to the age-old wisdom that "the

punishment should fit the crime." Campbell, who is now 46, will

serve 24 years in prison for -- at base -- producing a quantity

of P2P that would have allowed manufacture of very little

  

 15 Trial testimony established that P2P has no legitimate
commercial use, and typically is used only to make amphetamine or
methamphetamine.

 16 We note that Campbell's alternative reading could have
been avoided with a slight change in phrasing: rather than "when
possessed for the purpose of manufacturing methamphetamine," the
provision could have provided that the 416 multiplier applied if
the P2P was possessed "with intent that it be used for"
manufacturing methamphetamine.

 -21-

methamphetamine. Under Congress's sentencing regime, we are

obliged to endorse this harsh result. See United States v. 

Jackson, 30 F.3d 199, 204-05 (1st Cir. 1994) (Pettine, J., 

concurring) (pursuant to guidelines' "mechanical sentencing," 40-

year-old defendant must serve "de facto life sentence" of 27

years).

 Accordingly, the district court's judgment is affirmed in 

all respects. 

 -22-