[NOT FOR PUBLICATION-NOT TO BE CITED AS PRECEDENT]

# United States Court of Appeals

## For the First Circuit

No. 01-1416

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE MARTE, A/K/A ABRAHAM,
A/K/A ABRAM, A/K/A EL DOCTOR,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell and Bownes, Senior Circuit Judges.

Thomas A. Zonay and Ford & Zonay, P.C. on brief for appellant.

Michael J. Sullivan, United States Attorney, Michael J. Pelgro, Assistant U.S. Attorney, and Susan M. Poswistilo, Assistant U.S. Attorney, on brief for appellee.

April 8, 2002

**BOWNES**, **Senior Circuit Judge**.  Defendant-appellant Jose Marte, along with nineteen other individuals, was charged in a multi-count indictment of knowingly and intentionally conspiring to possess with intent to distribute and distributing quantities of heroin in violation of Title 21 U.S.C. § 841(a)(1).  Page three of the indictment stated that because the conspiracy described in Count I involved one kilogram or more of a heroin mixture, the provisions of 21 U.S.C. § 841(b)(1)(A)(i) applied, and therefore a minimum sentence of ten years was mandated.

Marte entered a guilty plea to Count I pursuant to a written plea agreement with the government.  After a sentencing hearing, the district court sentenced Marte to 168 months (14 years) in prison and 5 years supervised release.

Two issues are before us:  (1) whether the district court erred in determining that the amount of heroin Marte conspired to distribute amounted to one kilogram or more; and (2) whether the district court erred in finding that Marte was a supervisor or manager in the framework of the heroin conspiracy.

I.  **BACKGROUND**

The investigation that culminated in this case started in August, 1996, and ended in July, 1999.  It ferreted out an extensive conspiracy to purchase heroin from sellers in New York City and transport it to Lynn, Massachusetts, where it was

processed and stored.  The heroin was then sold to customers in Massachusetts, Vermont, and other states.

Starting in 1996, a Drug Enforcement Agency ("DEA") undercover agent bought good-sized quantities of heroin from Angel Lopez and others in Lynn.  In June, 1998, the DEA was judicially authorized to place wiretaps on three telephones used by Lopez and others so as to obtain information about their heroin trafficking. The wiretapped conversations led the DEA to conclude that Domingo Acevedo and his brother, Rafael, were the sources of Lopez's heroin purchases and that Domingo's apartment at 193 Essex Street was used as an office in which heroin sales were discussed and settled by telephone.

The DEA was judicially authorized to install a wiretap on the phone in Domingo Acevedo's apartment at 193 Essex Street in Lynn.  Based on the conversations recorded by this wiretap, the DEA learned that Marte and Nicholas Moreno, inter alia, regularly bought large amounts of heroin in New York City.  The heroin was supplied to the Acevedo brothers, who in turn resold it to Lopez and others.  The DEA also learned that Marte and Moreno used the apartment at 193 Essex Street as a base of operation for planning heroin sales and trips to New York City to obtain heroin.

In the fall of 1998 the DEA in Vermont investigated heroin trafficking in Barre, Vermont, and its environs.  The Vermont DEA learned that heroin was being sold regularly to

residents of Vermont by Jesus Veadejo, who resided in Lynn, Massachusetts. Veadejo was arrested in early December, 1998. As a result, it was determined that Marte regularly sold heroin to Veadejo, who resold it to Vermont dealers, who took it to Vermont for sale to retail customers.

In early February, 1999, the DEA obtained authorization for four more wiretaps. Three of the wiretaps were the sources of incriminating evidence. These wiretaps established, inter alia, that an apartment at 345 Essex Street in Lynn, shared by two of the indicted conspirators, was also used as an office for discussing and consummating heroin transactions.

## II. DISCUSSION

Clear error is the standard we apply in assessing the district court's findings concerning the quantity of heroin and Marte's role in the conspiracy. United States v. Caba, 241 F.3d 98, 102 (1st Cir. 2001); United States v. Hernandez, 218 F.3d 58, 71 (1st Cir. 2000). We review de novo the district court's interpretation of the Sentencing Guidelines and its application of the law. United States v. Muniz, 49 F.3d 36, 41 (1st Cir. 1995).

We first set forth the pertinent law of sentencing. We start with the Guidelines: "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of controlled substance." U.S.S.G. § 2D1.1, cmt. n.12 (2001)(emphasis added). The rule in this

Circuit is that a reasonable determination of drug quantity may be used where "it is impossible or impractical to obtain an exact drug quantity for sentencing purposes." United States v. Morrill, 8 F.3d 864, 871 (1st Cir. 1993); see also United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999); United States v. Rodriguez, 162 F.3d 135, 149 (1st Cir. 1998). We have also held, however, that a reasonable estimate of drug quantity must be based on adequate indicia of reliability and support in the record. United States v. Rivera-Maldonado, 194 F.3d 224, 228 (1st Cir. 1999). Moreover, a district court judge should follow a "conservative approach" when determining huge quantities. United States v. Sklar, 920 F.2d 107, 113-14 (1st Cir. 1990).

As is usual in sentencing appeals, the district court used the presentence report (PSR) as the primary source for its findings of facts. It also examined witness statements and three affidavits of co-conspirators submitted by the government. Our careful examination of the evidence, as contained in the PSR and affidavits, convinces us that the district court did not clearly err in finding that Marte conspired to distribute more than one kilogram of heroin. Nor was it clearly erroneous for the district court to find that Marte's role in the conspiracy was that of a manager or supervisor.

The evidence as to drug quantity is to the following effect. Marte was involved in the heroin business with Moreno.[1] At times Marte was a wholesale buyer for Moreno and at other times he and Moreno, working together, supplied heroin to joint customers. Although the district court did not explicitly so find, we think the evidence amply permitted it to have found that Marte and Moreno knowingly worked together as the principal wholesale suppliers for the conspiracy. Under well-established conspiracy doctrine, either could be found responsible for the sales by the other. See, e.g., United States v. O'Campo, 973 F.2d 1015, 1021 (1st Cir. 1992).

Sometime in 1998, Moreno introduced Marte to Moreno's New York heroin source. From then on Marte bought heroin directly from the source rather than from Moreno. Moreno told another indicted conspirator, Rafael Acevedo, that he (Moreno) "provided approximately 200 grams every 25-30 days to Marte" from the beginning of 1998.

Acevedo, who usually purchased from Moreno, stated in an affidavit that he purchased heroin directly from Marte "more than five times." These purchases amounted to at least forty to fifty grams. Marte and Moreno used agents to go to New York and purchase heroin for him. Bolivar Jiminez went to New York on several occasions and picked up hundreds of grams of heroin. Rome Godoy,

_____

[1]Moreno fled before he could be arrested.

a.k.a. Elizabeth Ruiz, also went to New York for Moreno and Marte several times; on one such occasion she picked up 100 grams of heroin.

On June 9, 1998, Marte was arrested by the police in Chelsea, Massachusetts, after he had struck one of the arresting officers with his automobile in an attempt to escape. Over 110 bags of heroin with a net weight of 2.01 grams were found in his car. On August 10 and 11, 1998, wiretap conversation established that Marte supplied Lopez with 58.6 grams of heroin, which Lopez sold to an undercover DEA agent for $7,000. On August 15, another wiretap conversation established that Marte told Moreno that he had given "500" to another person in the past week.

Additional findings as to drug quantity were set forth in the PSR. Marte's use of Jiminez and Godoy as his agents to obtain the heroin in New York and deliver it to his office in Lynn established that 300 grams of heroin were attributable to Marte. The arrest of Marte by the police in Chelsea involved 252.9 grams of heroin for which Marte was responsible. Marte supplied his Vermont connection, Veadejo, with 129.6 grams of heroin over time. Marte had stored 140 grams of heroin at the Chatham Street apartment. The total amount of heroin that the PSR found attributable to Marte was 1,422.5 grams, which translated into 1.4 kilograms.

In light of this evidence, we conclude that there was no double counting. No good reason has been advanced for doubting the Probation Department's statement that if there was a question that the drugs had already been counted, it did not attribute the second amount to Marte. Moreover, we see no error in the PSR's determination of drug quantity.

Marte contends strenuously that there are "direct inconsistencies" between statements in the affidavits and the determinations in the PSR. He points specifically to paragraph 13 of the PSR, which states: "Marte supplied Domingo Acevedo with 200 grams of heroin every 20 to 30 days." The government's response is that paragraph 111 of the PSR contained an error in transcription and that paragraph 13, which was the basis for the analysis, stated correctly that "Moreno supplied Marte with 200 grams every 20 to 30 days." It further points out that if paragraph 13 is accepted, there is no discrepancy between the affidavits and the PSR statement. The government also notes that the district court was advised of the transcription error in paragraph 111. The only thing that is lacking is an indication by the district court that it was aware of the transcription error. That is hardly sufficient, however, to find that there was clear error in the court's finding of the amount of heroin involved.

Finally, the PSR stated that Jiminez, Godoy, and Veadejo worked under the supervision and control of Marte. There was

adequate evidence for this finding and the district court did not err in increasing Marte's sentence to reflect his role in the offense.

**We affirm the sentence of the district court in all respects**.